UNITED STATES ex rel.
Ron DeCESARE, et
al., Plaintiff,

v.

AMERICARE IN HOME NURSING,
et al., Defendants.

No. 1:05cv696.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 16, 2010.

🔑35

James Patrick Hodges, Hodges & Associates PC, Leesburg, VA, Lee Brinson Warren, Zachary Alan Kitts, Cook Kitts & Francuzenko PLLC, Fairfax, VA, for Plaintiff.

Andrew L. Hurst, Reed Smith LLP, Washington, DC, for Americare.

Jesse A. Witten, Jeffrey Joseph Lopez, Drinker, Biddle & Reath LLP, Washington, DC, for MedStar.

Steven E. Gordon, United States Attorney's Office, Alexandria, VA, for United States of America.

Zachary Alan Kitts, Lee Brinson Warren, for Relator Ron DeCesare.

Jane Drummey, District of Columbia Office of Inspector General, Washington, DC, for D.C.

Lelia Palmore Beck, Virginia Attorney General, Richmond, VA, for Commonwealth of Virginia.

Sherry A. Ingram, The Law Office of Stephen H. Marcus, Washington, DC, for Visiting Nurses Service Network and Eileen Dohmann.

## *MEMORANDUM OPINION*

JAMES C. CACHERIS, District Judge.

This matter comes before the Court on Defendant Medstar Health Visiting Nurse Association's ("Medstar") Motion to Dismiss [Dkt. 61] ("Medstar MTD"), Defendant Kathleen Ammirati's Motion to Dismiss [Dkt. 64] ("Ammirati MTD"), Defendants Americare In Home Nursing ("Americare") and Kathleen Ammirati's Joint Motion to Dismiss [Dkt. 66] ("Americare MTD"), and Defendants Eileen Dohmann and Visiting Nurse Service Network, Inc.'s ("VNSN") Motion to Dismiss [Dkt. 69] ("VNSN MTD"). For the reasons stated below, the Court will grant Defendants MedStar and Ammirati's motions and will deny the remaining motions.

## I. Background

This *qui tam* matter involves an alleged home health care referral kickback scheme. Plaintiff Ron DeCesare is suing Defendants on behalf of the United States, the Commonwealth of Virginia, and the District of Columbia for alleged violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, the Virginia Fraud Against Taxpayers Act, Va.Code. § 8.01–216.3, and the District of Columbia Procurement Reform Amendment Act, D.C.Code § 1–1188.14.

### A. *Statutory Background*

Medicare Part A is a program administered by the U.S. Department of Health and Human Services ("DHHS") providing health insurance benefits for services "reasonable and necessary" for diagnosis and treatment. 42 U.S.C. §§ 1395c–1395i–5; 42 U.S.C. § 1320c–5(a). "Fiscal intermediaries" (private entities, often insurance companies) typically handle Medicare reimbursement to service providers. 42 U.S.C. § 1395h. Medicaid is a program providing federal funding for state medical services to the poor in participating states, including Virginia and the District of Columbia.

To obtain Medicare and Medicaid reimbursements, home health care agencies submit claims for payment via a specific form. 42 C.F.R. § 424.32. At the end of the fiscal year, providers must also submit reports listing all costs to be reimbursed. 42 C.F.R. § 405.1801(b)(1). Such cost reports include the following language:

Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

(Am. Compl. ¶ 33.) Both Medicare and Medicaid additionally require that providers sign agreements agreeing to comply with their requirements, including those pertaining to fraud and abuse. (Am. Compl. ¶ 35.)

Important to the instant case, Congress in 1987 amended the health care Anti–Kickback Statute in an attempt to deter the use of payments as inducements for health care referrals. *See* 42 U.S.C.A. § 1320a–7b. Compliance with the Anti–Kickback Statute is a precondition for participation in federal health care programs. 42 U.S.C. 1320a–7b(b). The Anti–Kickback Statute prohibits making or accepting payments to induce or reward referrals for federally-funded health care services. *Id.* It includes a "safe harbor" exception, however, for payment practices authorized by the Secretary of Health and Human Services. *See* Pub.L. No. 100–93, § 14(a), (b)(3), 101 Stat. 680 (1987) (codified at 42 U.S.C. § 1320a–7b(b)(3)(E)).

Among the safe harbor's authorized practices are "referral services"; however, a number of criteria must be met to qualify for this safe harbor. *See* 42 CFR § 1001.952(f). First, referral services must not exclude otherwise qualified participants. *Id.* Second, payments to referral services must be assessed and collected equally from all participants, based only on the cost of operating the services, not on the volume or value of the referrals. *Id.*

Third, the referral services must impose no requirements for providing services to referred persons, except that they may require that such persons be charged the same rate as non-referred persons, or reduced rates. *Id.* Fourth, the services must and keep make five written disclosures to people seeking referrals: (i) the manner in which they select participants, (ii) whether participants pay a fee to the referral service, (iii) the manner in which the patient's provider was selected, (iv) the nature of the relationship between the referral service and its participants, and (v) any restrictions that would exclude participants from continuing participation in the referral service. *Id.*

Compliance with the Anti–Kickback statute is required for providers under Medicare, Medicaid, and other federal healthcare programs. (Am. Compl. ¶ 42.) Providers must certify compliance with this and other applicable federal rules and regulations via provider agreements, claim forms, or in other appropriate manners. (Am. Compl. ¶ 43.)

### B. *Factual Background*

Plaintiff Ron DeCesare ("Plaintiff" or "Relator") is the owner of Professional Healthcare Resources, Inc., a home health care agency based in Annandale, Virginia. (Am. Compl. ¶ 13.) Defendant Americare is a home health care agency based in Falls Church, Virginia, of which Defendant Kathleen Ammirati is Chief Executive Officer and Defendant Mary Tatum is Director of Nursing. (Am. Compl. ¶¶ 14–16.) Defendant MedStar is a home health care agency based in the District of Columbia and doing business in Virginia. (Am. Compl. ¶ 17.) Defendant VNSN is a referral agency for patients from the Virginia Hospital Center ("VHC") requiring home health care, based in Centerville, Virginia, at which Defendant Eileen Dohmann is

Executive Director. (Am. Compl. ¶¶ 18–19.)

According to the Amended Complaint, from 2002 to today, Americare (including Ammirati and Tatum) and MedStar have been paying kickbacks to VNSN and Dohmann in exchange for home-health care referrals for VHC patients. (Am. Compl. ¶ 2.) VNSN allegedly does not refer patients to other otherwise-qualified providers that refuse to pay it kickbacks. (Am. Compl. ¶ 4.)

Before 2002, INOVA Visiting Nurses Association provided liaison services for patients discharged from VHC requiring home-health care. (Am. Compl. ¶ 46). In early 2002, it announced that it was terminating these services, though some of its members stayed at VHC to assist discharge planners with home-health care referrals. (Am. Compl. ¶ 15.) In early 2002, VHC began looking for a single provider for its discharged patients' home health care needs and approached Professional Healthcare about providing such services on a trial basis of two-to-three months. (Am. Compl. ¶ 49.)

In May 2002, Professional Healthcare noted that VHC was referring fewer patients than expected (only 15 out of approximately 100 per month). (Am. Compl. ¶ 49.) To investigate this, DeCesare phoned VHC, where Ruth McGough, a discharge planner and a long-time personal friend, told him to speak with Eileen Dohmann, who was forming a referral network for the hospital. (Am. Compl. ¶ 50, 61.) Shortly afterwards, Dohmann called DeCesare inviting him to a meeting regarding the formation of this network. (Am. Compl. ¶ 51.)

DeCesare attended the meeting in April or May 2002, along with Dohmann, Dohmann's colleague, Dia Loken (Professional Healthcare's administrator for Northern Virginia), Bobbi Duffy (Professional Healthcare's Director of Sales), Duane Taylor (Americare's Chief Financial Officer), Duane Taylor, Mary Tatum, and a representative from Esprit Homecare, at Americare's office in Bailey's Crossroads. (Am. Compl. ¶ 52.) Dohmann ran the meeting, at which participants discussed the creation of a referral network for VHC patients. (Am. Compl. ¶ 53.)

Dohmann stated that the agencies at the meeting could expect to split 100 Medicare referrals per month from VHC, with each referral leading to a $3,000 Medicare reimbursement to each agency. *Id.* In return, the referral network was to receive a 7% fee from this volume of referrals (*i.e.*, $7,000 monthly per agency) and that referrals would in turn be divided evenly between the agencies. (Am. Compl. ¶ 54.) Participation would be limited to three agencies. (Am. Compl. ¶ 56, 58.) If one agency could not take its share of referrals, those referrals would be offered to another agency, with a commensurate increase in fee to the referral network. *Id.* For example, if only two agencies participated, each would receive 50 patients and pay $10,500.

At the meeting, DeCesare objected to the proposal and questioned the legality of these arrangements, as well as the potential conflict of Dohmann accepting referral fees from Esprit, an agency she had been involved with while serving as Executive Director of the referral network. (Am. Compl. ¶ 58.) Dohmann responded that lawyers had reviewed the proposal and determined it to be legal. (Am. Compl. ¶ 59.)

Following the meeting, DeCesare declined to participate in the referral network. (Am. Compl. ¶ 60.) After that, Professional Healthcare only received referrals from patients specifically requesting Professional Healthcare. *Id.* Ruth

McGough told him that Professional Healthcare would not receive additional referrals because it was not part of the VNSN. (Am. Compl. ¶ 61.)

Since 2002, VNSN referred VHC patients to participating agencies including Americare. (Am. Compl. ¶ 62.) DeCesare claims reason to believe that Americare has paid Dohmann the fee described above in exchange for these referrals. (Am. Compl. ¶ 63.)

Within a year of VNSN's inception, Esprit filed for Chapter 11 bankruptcy, naming VNSN as its largest creditor. (Am. Compl. ¶ 64.)

Within six months of VNSN's inception, MedStar was brought into the network. (Am. Compl. ¶ 65.) DeCesare claims reason to believe that MedStar has become a full participant in the network and that it pays VNSN based on the volume of Medicare referrals it receives. (Am. Compl. ¶ 66.)

Americare and Medstar have submitted claims for reimbursement arising from VNSN referrals to Medicare, Medicaid, and other state and federal health care programs. (Am. Compl. ¶ 67.)

DeCesare declined participation in VNSN due to concerns over its legality. (Am. Compl. ¶ 68.) In 2003, after learning of a potential safe harbor for referral services under the Anti–Kickback Statute, DeCesare asked his Director of Sales, Bobbi Duffy, to arrange a meeting with Dohmann to discuss strategies for complying with this safe harbor. (Am. Compl. ¶ 69.) Dohmann met with Duffy and told her that VNSN was not in need of additional providers. *Id.* Professional Healthcare also received a letter from VNSN in November, 2003, stating that "[a]t this time, [VNSN] is not accepting participants for the liaison service." (Am. Compl. ¶ 73.)

On or about August 2003, DeCesare and his counsel met with John Hogan, compliance officer for VHC, to voice concerns about kickbacks. (Am. Compl. ¶ 70.) Hogan responded that he was reviewing VHC's policies, but that he saw nothing wrong with them, and took no position regarding the allegations against VNSN. (Am. Compl. ¶ 71.) VHC's counsel sent Professional Healthcare a letter on August 28, 2003, memorializing this position. (Am. Compl. ¶ 72.) DeCesare then contacted VHC's CEO, Jim Cole, in January 2004, reiterating his kickback concerns. Cole responded that Professional Healthcare and DeCesare should "do what you need to do," and that he "understood" their position. (Am. Compl. ¶ 74.)

On February 18, 2004, Professional Healthcare sent a letter to Dohmann restating its belief that defendants were engaged in an illegal kickback scheme, suggesting that VNSN be restructured to comply with the safe harbor provision, and stating that compliance with the safe harbor requires acceptance of all qualified participants including Professional Healthcare. (Am. Compl. ¶ 75.) It received a response on February 25, 2004, denying the allegations, stating that VNSN is not violating the Anti–Kickback Statute, claiming that VNSN is not a referral network but is instead a preferred provider network for VHC, and arguing that its fees are simply costs associated with providing a "dedicated home care liaison" to VHC. (Am. Compl. ¶ 76.) VNSN also stated that it would report Professional Healthcare's allegations to the OIG. *Id.*

During 2004, DeCesare also became aware of Americare using practices to steer referrals such as offering hospital discharge planners upgrades on airline flights and gift cards for local department stores. (Am. Compl. ¶ 78.)

Defendants' alleged practices of soliciting and paying kickbacks for referrals are ongoing. (Am. Compl. ¶ 79.)

DeCesare filed an initial complaint on June 10, 2005. [Dkt. 1.] He then filed an amended complaint on August 23, 2006. [Dkt. 16.] Count 1 of the Amended Complaint alleged violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) & (a)(2). Count 2 alleged conspiracy to submit false claims, 31 U.S.C. § 3729(a)(3). Count 3 alleged violations of the Virginia Fraud Against Taxpayers Act. Va.Code. Ann. § 8.01–216.3(a)(1), (2). And Count 4 alleged violations of the District of Columbia Procurement Reform Amendment Act, D.C.Code Ann. § 1–1188.14(a)(1), (2).

The United States, the Commonwealth of Virginia, and the District of Columbia formally declined to intervene in the case on January 29, 2010. [Dkt. 39.] The matter was then unsealed on August 30, 2010. [Dkt. 45.] MedStar moved to dismiss on October 8, 2010 [Dkt. 61] ("MedStar MTD"), as did Kathleen Ammirati [Dkt. 64] ("Ammirati MTD"), and Americare [Dkt. 66] ("Americare MTD"). Dohmann and VNSN moved to dismiss on October 15, 2010. [Dkt. 69.] DeCesare opposed these motions on November 15, 2010.[1] [Dkts. 77, 78, 79, 80.] Americare and Ammirati filed their reply briefs on November 18, 2010 [Dkts. 82, 83], and VNSN/Dohmann and MedStar filed their reply briefs on November 19, 2010 [Dkts. 84, 86].[2] The motions to dismiss are before the Court.

## II. Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir.1994) (citation omitted). In deciding a Rule 12(b)(6) motion to dismiss, a court must first be mindful of the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8. Thus, a court must take "the material allegations of the complaint" as admitted and liberally construe the complaint in favor of a plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (citation omitted).

While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (citation omitted). Indeed, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Id.* at 1965. In its recent decision, *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court expanded upon *Twombly* by articulating the two-pronged approach to be followed in any Rule 12(b)(6) analysis. First, a court must identify and reject legal conclusions unsupported by factual allegations because they are not entitled to the presumption of truth. *Id.* at 1951. "[B]are assertions" that amount to nothing more than a "formulaic recitation of the elements" do not suffice. *Id.* (citations omitted). Second, assuming the veracity of "well-pleaded factual allegations", a court must conduct a "context-specific" analysis drawing on "its judicial experience and common sense" and determine whether the factual allegations "plausibly suggest an entitlement to relief." *Id.* at 1950–51. The plausibility standard requires more than a showing of "a sheer possibility that

---

**1.** The Court will refer to these opposition briefs as "[Defendant's name] Opp."

**2.** The Court will refer to these reply briefs as "[Defendant's name] Reply."

a defendant has acted unlawfully". *Id.* at 1949. In other words, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Rule 9(b) further requires that claimants "state with particularity the circumstances constituting fraud or mistake." Fed. R.Civ.P. 9(b). Failure to comply "with Rule 9(b)'s particularity requirement for allegations of fraud is treated as a failure to state a claim under Rule 12(b)(6)." *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 n. 5 (4th Cir.1999) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 901 (5th Cir.1997)). "[T]he 'circumstances' required to be pled with particularity under Rule 9(b) are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." " *Harrison,* 176 F.3d at 786 (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 290 at 590 (2d ed.1990)); *see also United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 379 (4th Cir.2008); *Scott v. GMAC Mortg., LLC,* No. 3:10cv24, 2010 WL 3340518, at *2 (W.D.Va. Aug. 25, 2010).

Rule 9(b) has four purposes: (1) to ensure that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of, (2) to protect defendants from frivolous suits, (3) to eliminate fraud actions where all facts are learned after discovery, and (4) to protect defendants from harm to their goodwill and reputation. *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999). "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.*

## III. Analysis

### A. *MedStar's Motion to Dismiss*

#### i. *Rule 9(b)*

■ MedStar's first argument for dismissal is that the Amended Complaint's fraud allegations fall short of what is required by Federal Rule of Civil Procedure 9(b). That rule requires, again, that circumstances of fraud be pled with particularity as to the "who, what, where, when, and why," of the alleged fraud. *See Feeley v. Total Realty Mgmt.,* 660 F.Supp.2d 700, 704–05 (E.D.Va.2009). According to MedStar, the Amended Complaint's MedStar-related allegations are as follows: MedStar contracted with VNSN six months after VNSN began, MedStar pays a fee to VNSN based on the volume of referrals it receives, and MedStar submits claims to Medicare and to Virginia and D.C. Medicaid. (MedStar MTD at 9.)

What is missing, in MedStar's view, are specifics as to MedStar personnel who acted improperly, amounts or dates of improper payments or reimbursements by MedStar, patients whose MedStar referrals were improperly procured, or examples of false MedStar claims submitted to federal programs. (MedStar MTD at 10.)

Relator responds that its allegations, though not singling out individual MedStar transactions or participants, are adequate because they show that VNSN divided 100 monthly Medicare/Medicaid referrals between three providers, that VNSN operated in violation of the Anti–Kickback Statute, that MedStar participated in VNSN, and that MedStar therefore submitted fraudulent claims for reimbursement. (MedStar Opp. at 12.) The essence of this

argument is that *none* of VNSN's referrals to MedStar and MedStar's subsequent reimbursements and certifications could have been legitimate because VNSN was not legitimate itself.

That separates this case from one like *United States ex rel. Elms v. Accenture LLP*, 341 Fed.Appx. 869 (4th Cir.2009), which MedStar relies upon. *Elms* involved an alleged scheme where a government contractor failed to credit its subcontractor's rebates back to the government on a cost-based contract. The claim failed in that case because the relator did not allege any specific credits or rebates that were improper and because the relator could not attribute the alleged misrepresentation—that the defendant was not receiving any rebates—to any employee or identify where and when such representation was made. *Id.* at 873. In short, the relator in that case could do no more than allege generally that fraud must be occurring, not that fraud actually occurred.

Here, although Relator also does not point to a specific moment of fraud in terms of a time and date, he does allege facts that, if true, show that MedStar made false representations to the federal government. He does not simply state that MedStar and VNSN engaged in an illegal kickback scheme, he alleges facts to show that *every* certification submitted by MedStar for patients referred from VNSN was false. It is therefore no mystery to MedStar what conduct it must defend in this case: certifications in its patient-specific claims and annual cost reports for patients referred by VNSN.

This Court therefore moves on to the issue of scienter.

### ii. *Scienter*

All four of the Amended Complaint's counts contain a scienter requirement. *See Harrison*, 176 F.3d at 788 (Counts 1 and 2) ("The test for [FCA] liability ... is ... (1) whether there was a false statement ... (2) made or carried out with the requisite scienter...."); Va.Code. Ann. § 8.01–216.3(A)(1), (2) (Count 3) (implicating "[a]ny person who *knowingly*" makes a false claim or statement) (emphasis added); DC Code Ann. § 2–308.14(a)(1), (2) (formerly § 1–1188) (Count 4) (same).

Federal Rule of Civil Procedure 9(b) explains that "malice, intent, *knowledge,* and other condition[s] of mind" may be "alleged generally." (emphasis added). "It is true that Rule 9(b) requires particularity when pleading fraud or mistake, while allowing ... knowledge ... [to] be alleged generally." *Iqbal,* 129 S.Ct. at 1954 (internal quotation marks omitted). "But 'generally' is a relative term." *Id.* "In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake." *Id.* "Rule 9 merely excuses a party from pleading [states of mind] under *an elevated* pleading standard. It does not give him license to evade the less rigid-though still operative-strictures of Rule 8." *Id.* (emphasis added).

■ That means that Relator must give sufficient factual support for-knowledge to satisfy Rule 9(b). And here, the Amended Complaint is lacking. For each count, it does state that "defendants knowingly" made false statements. (*See* Am. Compl. ¶¶ 83, 84, 90, 96, 97, 103, 104.) But nowhere else does the Amended Complaint present *facts* showing MedStar's *knowledge* that its certifications falsely reported the absence of kickbacks. The closest it comes is the statement that "MedStar pays a fee to the [VNSN] based on the volume of Medicare referrals it receives." But this allegation, taken as true, does not equate to knowledge of wrongdoing. The Amended Complaint provides few if any facts supporting *MedStar's* knowledge of what its fee amount is based on, let alone

MedStar's knowledge that its certifications allegedly contain false statements.

Thus, because the Amended Complaint fails to allege scienter against MedStar, this Court will grant MedStar's Motion to Dismiss.

### iii. *The Conspiracy Count (Count 2)*

■ Putting aside scienter, the Conspiracy Count (Count 2) runs into similar problems with respect to MedStar. To prove an FCA conspiracy, a relator must show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim reimbursed by the government and (2) at least one act performed in furtherance of that agreement. *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir.2008). Moreover, "a plaintiff asserting a claim under § 3729(a)(3) must show that the conspirators agreed to make use of the false record or statement to achieve this end." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 665, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008). The conspirators must have "shared a specific intent to defraud the Government." *Farmer*, 523 F.3d at 343 (citation omitted).

■ Here, to the extent a conspiracy was fairly pled, MedStar's membership was not. As explained above, the Amended Complaint fails to show that MedStar was aware of any agreement, let alone that it knowingly joined one. Nor does the Amended Complaint provide facts showing that MedStar had any intent to defraud the government, let alone a shared specific intent to do so. Thus, even if the claims against MedStar were not dismissed for want of scienter, Count 2 must be dismissed.

### B. *Americare's Motion to Dismiss*
#### i. *Rule 9(b)*

Like MedStar, Americare first takes issue with the Amended Complaint's failure to identify a specific false claim or a specific employee who behaved improperly.

■ Regarding identification of a specific false claim, as with MedStar, the nature of the alleged conduct is such that that additional detail is unnecessary to avoid dismissal. Relator sufficiently alleges that *every* certification Americare submitted for a VNSN-referred patient contained a false statement. So it is clear to Americare that it must defend every certification submitted the government for a patient referred by VNSN.

On the issue of the "who," under Rule 9(b), Americare argues that, "[w]here an FCA defendant is a corporate entity, the Relator must identify the individuals involved in the fraud and may not rest on generalized assertions that 'the company' committed the complained-of conduct." (Americare MTD at 6.) That may be true in *some* cases, but it is not a universal rule. Nor is it stated as such in *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142 (N.D.Ill.1993), the case Americare cites for that proposition. It was inadequate in that case for the relators to allege that "Northrop employees" committed certain acts—particularly because the relators were Northrop employees with access to the actual names of the employees they were referencing. *Id.* at 145 n. 2. More specificity was needed for the defendant to know which of its 35,000 employees were implicated. *Id.* at 146.

Like *Northrop*, the relator in another case cited by Americare, *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048 (9th Cir.2001), was a long-standing employee of SmithKline and therefore had "no legitimate excuse" for failing to name names in its complaint. *Id.* at 1052.

Here, the Amended Complaint in this case is far more specific than those in

*Northrop* and *SmithKline.* Relator is not a former Americare employee, and the Amended certifications are signed by "the chief administrator of the provider or a responsible designee of the administrator." (Am. Compl. ¶ 33.) And, again, the Complaint applies to all certifications submitted for patients referred by VNSN. This is enough to apprise Americare of the employees who may have acted wrongly.

### ii. *Allegations of False Claims*

■ Americare next argues that the Amended Complaint lacks a factual basis to show that patients "that were referred to Americare were eligible for Medicare or Medicaid, as distinguished from patients with private insurance," and, more generally, that Americare served patients referred by VNSN and billed government entities for such services. (Americare MTD at 8.) The Court disagrees.

The Complaint first explains a theory of how VNSN's policies violate the Anti–Kickback Statute. (Am. Compl. ¶ 37–43, 53–57.) It alleges that Americare was present at a meeting discussing these policies and the formation of VNSN. (Am. Compl. ¶ 52.) It alleges that "home health agencies at the meeting could expect 100 *Medicare* referrals per month." (Am. Compl. ¶ 53 (emphasis added).) It alleges that, since 2002, VNSN referred patients to Americare. (Am. Compl. ¶ 62.) It alleges that Americare paid VNSN inappropriate fees for these referrals. (Am. Compl. ¶ 63.) And it alleges that Americare submitted claims for reimbursement arising out of referrals from VNSN. (Am. Compl. ¶ 67.) Taken together, these allegations are sufficient to show that Americare served VNSN patients and billed government entities for its services.

### iii. *Double Falsity Requirement*

■ Americare next argues that Counts 1, 3, and 4 of the Amended Complaint fail to satisfy the "double falsity"

requirement of the FCA. (Americare MTD. At 9.) A claim under § 3729(a)(2) of the FCA must allege both that (1) a false record or statement was used to obtain (2) a false claim paid by the government. *United States ex rel. Oliver v. Parsons Corp.*, 498 F.Supp.2d 1260, 1278 n. 20 (C.D.Cal.2006). The point is well-taken, but ultimately irrelevant here, as Relator does not rely solely on § 3729(a)(2) but also on § 3729(a)(1), which has no double falsity requirement. *See United States ex rel. Franklin v. Parke–Davis,* No. 96–11651, 2003 WL 22048255, at *2 (D.Mass. Aug. 22, 2003) ("Because Relator has not limited his FCA claim to § 3729(a)(2), he need not show two falsehoods to prevail.") (cited in *Oliver* ).

### iv. *Allegations Regarding Medicaid Statutes*

■ Americare next argues that Counts 3 and 4 of the Amended Complaint (the state law claims) fail to state allegations creating liability under the Virginia or D.C. Medicaid programs. (Am. Compl. ¶ 10.) The gist of this argument is that Relator's allegations are too simplistic to account for the fact that Medicaid is run on a state-by-state basis. The Court disagrees. Paragraph 35 of the Amended Complaint states that, "Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he/she will comply with all Medicaid requirements, including the fraud and abuse provisions." Paragraph 67 further states that Americare has submitted claims for reimbursement for services arising out of VNSN referrals to Medicaid in both Virginia and D.C. While these allegations are perhaps not as detailed or thorough as the Medicare allegations, they fairly allege that Virginia and D.C.'s Medicaid programs require certifications, that Ameri-

care submitted such certifications, and that those certifications were false or fraudulent.

### v. *Conspiracy Allegations*

With regard to Count 2 of the Amended Complaint, Americare argues that, because "the Amended complaint alleges that the alleged conspirators formed the Network only *after* seeking guidance and obtaining legal advice that the arrangement was compliant with applicable laws and regulations," there could not have been an agreement to defraud or an intent toward that end. (Americare MTD at 11 (emphasis added).) This is essentially an argument that the Amended Complaint supports the affirmative defense of good faith reliance on advice of counsel.

To establish that defense, a defendant must show (1) full disclosure of all pertinent facts to an expert and (2) good faith reliance on the expert's advice. *United States v. Butler*, 211 F.3d 826, 833 (4th Cir.2000). Defendants' argument fails at the first element, as the Amended Complaint does not show that all relevant facts were disclosed to Defendants' counsel prior to reliance upon their opinions.

As to the viability of the conspiracy count in general, again, an FCA conspiracy requires (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim reimbursed by the government and (2) at least one act performed in furtherance of that agreement. *Farmer*, 523 F.3d at 343. This Court finds these elements met. Relator fairly alleges that he attended a meeting along with an Americare executive where a plan was discussed to dole out referrals in exchange for fees charged by volume, and to limit the number of providers that could participate in the plan. (Am. Compl. ¶¶ 52–57.) Relator alleges that these practices run afoul of the Anti-Kickback

Statute. (Am. Compl. ¶¶ 38, 41.) Relator alleges that the plans discussed at the meeting were implemented. (Am. Compl. ¶¶ 60–67, 79.) And Relator alleges that false or fraudulent claims were submitted as a result. (Am. Compl. ¶ 67.) These allegations are sufficient to survive a motion to dismiss.

### vi. *Conditions of Participation vs. Conditions of Payment*

Americare's final argument is that the Amended Complaint characterizes Medicare/Medicaid certifications of compliance with the Anti-Kickback Statute as a condition of "participation" in federal healthcare programs as opposed to a condition of "payment" by the government. (Americare MTD at 12.) FCA liability arises not merely because "a false statement is included within a claim, but rather the claim itself must be false or fraudulent." *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group*, 400 F.3d 428, 443 (6th Cir.2005). Only materially false certifications—those that would lead the government to make payments it would not otherwise have made—are actionable. *United States ex rel. Conner v. Salina Reg'l Health Center, Inc.*, 543 F.3d 1211, 1220 (10th Cir.2008).

This argument is belied by the language of the Amended Complaint. Because while the Amended Complaint in some places does make statements like "[c]ompliance with the Anti-Kickback law is a precondition to participation as a health care provider" in federal programs (Am. Compl. ¶ 42), it also states that "pursuant to ... claim forms ... providers that participate in a federal health care program ... must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback law." (Am. Comp. ¶ 43.) The latter

sentence does not merely state a condition of participation, it states a prerequisite *for participants* submitting *claim forms* (*i.e.,* requests for payment). Moreover, the Amended Complaint also states, "as a prerequisite to payment for Medicare," agencies must "submit annually a Cost Report as the final claim ... for items and services rendered to Medicare beneficiaries." (Am. Compl. ¶ 31.) This sentence alone fairly alleges materiality of the certifications.

\* \* \*

This Court will therefore deny Americare's Motion to Dismiss.

### C. *Kathleen Ammirati's Motion to Dismiss*

█ Defendant Kathleen Ammirati's name appears only once in the Amended Complaint, in Paragraph 16, which states: "Defendant Kathleeen Ammirati is the Chief Executive Officer of Americare In Home Nursing." Plaintiff's apparent point is that "[i]n the capacity of Executive Director, she was authorized to sign some or all of the false claims alleged by DeCesare in his First Amended Complaint." (Ammirati Opp. at 1.) Even if that explanation were included in the Amended Complaint, it would still fall far below the threshold for surviving a motion to dismiss with respect to Ammirati. *See, e.g., F.T.C. v. Swish Marketing,* No. 09–3814, 2010 WL 653486, at \*4–5 (N.D.Cal. Feb. 22, 2010) (naming of CEO as a defendant with minimal detail (though more than the instant case) fell short of *Twombly* ). Relator fails to allege a single instance of *conduct* by Ammirati. Therefore, without any facts to support the allegations against Ammirati, this Court will grant dismissal with respect to claims against her.

### D. *VNSN and Eileen Dohmann's Motion to Dismiss*

█ In their Motion to Dismiss, Defendants VNSN and Dohmann[3] argue that the Amended Complaint fails to state claims for fraud (Counts 1, 3, and 4) and for conspiracy (Count 2) under the FCA. With regard to the fraud claim, the FCA requires that a relator prove:

> (1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due.

*United States ex rel. Godfrey v. KBR, Inc.,* 360 Fed.Appx. 407, 410 (4th Cir.2010) (quoting *United States ex rel. Harrison v. Westinghouse Savannah River Co.,* 352 F.3d 908, 913 (4th Cir.2003)). The Court considers each element in turn before turning to the conspiracy issue.

#### i. *False Statements*

The FCA imposes liability where any person "knowingly presents, or causes to be presented, to ... the United States Government ... a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). The FCA was written "to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County, Ill. v. United States ex rel.*

---

**3.** For simplicity's sake, this Court will refer to Defendants VNSN and Dohmann as "VNSN"

when appropriate in discussing this motion.

*Chandler*, 538 U.S. 119, 129, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (citation omitted). And "[t]he wealth of case law supports the proposition that the FCA reaches claims that are rendered false by one party, but submitted to the government by another." *Mason v. Medline Indus., Inc.*, No. 07c5615, 731 F.Supp.2d 730, 738, 2010 WL 653542, at *7 (N.D.Ill. Feb. 18, 2010) (citing, *e.g., United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544–45, 63 S.Ct. 379, 87 L.Ed. 443 (1943)).

█ Here, Defendants VNSN and Dohmann dispute what is required to "cause" a false statement to be made. Defendants argue that the Amended Complaint fails to adequately allege causation because it does not allege their "participation" in the submission of false claims. (VNSN MTD at 8; VNSN Reply at 2–5 (referring to a "requirement that the defendant participate in the claims process").) Specifically, Defendants claim it must be shown that they "proximately caused" the other Defendants to submit false claims and took an "affirmative act with respect to the presentation of a false claim." (VNSN Reply at 2.) In other words, Defendants claim that liability "requires some degree of involvement in submitting a false claim." (VNSN Reply at 3.)

In support of this claim, Defendants rely primarily on two cases: *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir.2006), and *United States v. President and Fellows of Harvard College*, 323 F.Supp.2d 151 (D.Mass.2004). Defendants further argue that these cases should be favored over *United States ex rel. Schmidt v. Zimmer*, 386 F.3d 235 (3d Cir.2004), which they claim exceeded the FCA's bounds in finding FCA violations without direct participation in submission of false claims. (VNSN Reply at 3 n. 2.)

Both *Sikkenga* and *Harvard* involved alleged failures to prevent parties from filing false claims despite knowing those claims to be false—a different issue from *Zimmer* and from the instant case, neither of which feature failure-to-prevent scenarios. *See* 472 F.3d at 713, 323 F.Supp.2d at 187. Both cases *upheld* FCA actions against parties who did not themselves file false claims, but who, through *some* affirmative action, permitted other parties' false claim filings to occur. 472 F.3d at 715, 323 F.Supp.2d at 187–88. But neither case announced a rule that, for *all* FCA claims (not just ones involving failures to prevent false claims), causation is only established by actions *during* (rather than preceding) the filing a claim.

In *Sikkenga*, for instance, one of the accused Medicare provider's two "actions" the court found sufficient—" 'agreeing to circumvent' contractual and statutory requirements"—would have preceded the filing of false claims. 472 F.3d at 715. The other "action"—"assuring" a university laboratory that it would continue to accept improper claims—presumably preceded actual filings as well, at least in some cases. *Id.* This was not contemporaneous participation in the claims filing process, yet it warranted *overturning* dismissal for lack of causation. *Id.*

*Harvard* involved slightly more active "actions," but overall may be even less supportive than *Sikkenga.* It upheld an FCA claim against a university employee who approved invoices and expenses where it was foreseeable that the invoices would be submitted to the government. 323 F.Supp.2d at 187. At one point it stated that, "To 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required." *Id.* at 186–87. But just one paragraph later, it further stated that "[s]ome courts have insisted that the de-

fendant have some role in the claim process. On the other hand, most courts agree that the FCA covers 'indirect mulcting of the government.'" *Id.* at 187 (citing *United States v. Lagerbusch,* 361 F.2d 449, 449 (3d Cir.1966)).

The court did not state exactly what "role" in the claims process must be alleged. Instead it focused its analysis on the question of *foreseeability.* Where it was foreseeable to the defendant that the claims at issue would be submitted to the government, FCA liability followed. *Id.* at 187.

The same was true in *Zimmer.* Far closer to the instant case than *Sikkenga* and *Harvard,* it involved a marketing scheme whose foreseeable result was the filing of false claims. 386 F.3d at 244–45. Citing "ordinary causation principles from negligence law," the court examined whether the defendant's conduct was "a substantial factor in bringing about" the false filing. *Id.* at 244. It looked, in other words, for proximate causation. And under that inquiry, where a necessary and foreseeable result of the defendant's actions is the filing of a false claim with the government, the FCA applies.

One recent case similar to this one illustrates this principle particularly well. *Mason v. Medline Industries, Inc.,* 731 F.Supp.2d 730 (N.D.Ill.2010), involved a *qui tam* suit against Medline, a manufacturer and distributor of medical-surgical supplies used by healthcare providers, for allegedly using kickbacks and bribes to solicit providers' business, which later resulted in false Medicare/Medicaid claims by those providers. *Id.* at 732–33. Because "the necessary and foreseeable consequence" of Medline's alleged bribes and kickbacks "was the submission of cost reports and the accompanying certifications," the Court found dismissal unwarranted. *Id.* at 738.

The same is true here. According to Relator, VNSN was founded by Dohmann on several illegal practices for the purpose of referring home care patients for reimbursement by Medicare or Medicaid. (*See, e.g.,* Am. Compl. ¶ 53, 54.) And according to Relator, VNSN, run by Dohmann, made such referrals for a number of years beginning in 2002. (*See, e.g.,* Am. Compl. ¶ 62.) Taking these allegations as true, it was a necessary, foreseeable, and obvious consequence of VNSN's referrals that Medicare and Medicaid claims would be filed. The Complaint therefore fairly alleges that VNSN and Dohmann caused the filing of false claims.

### ii. *Scienter*

As explained above, the FCA applies to anyone who "knowingly" presents or causes to be presented a false claim for payment, as do the state fraud claims. 31 U.S.C. § 3729(a)(1); Va.Code. Ann. § 8.01–216.3(A)(1), (2); DC Code Ann. § 2–308.14(a)(1), (2) (formerly § 1–1188). "Knowingly" under the FCA means acting (1) with actual knowledge of falsity of information, (2) in deliberate ignorance of the truth or falsity of that information, or (3) in reckless disregard for its truth or falsity. *Id.* at § 3729(b). And while Rule 9(b) permits knowledge to be "alleged generally" as compared to fraud or mistake, it does not excuse the requirement of a sufficient factual basis to support allegations of knowledge. *Iqbal,* 129 S.Ct. at 1954. The complaint must allege facts sufficient to find the knowledge required for FCA liability.

 With regard to VNSN and Dohmann, scienter is adequately pled. Dohmann allegedly invited Relator to attend a meeting she ran where the formation of VNSN was discussed. (Am. Compl. ¶¶ 51– 53.) Dohmann allegedly laid out terms at that meeting for participation in VNSN—

an allegedly illegal referral network. (Am. Compl. ¶¶ 53–57.) And since that meeting, VNSN allegedly referred patients from VHC to participating providers in exchange for fees paid by referral volume. (Am. Compl. ¶¶ 62, 63, 66, 67.) And, as explained above, VNSN and Dohmann allegedly knew that the providers would seek federal reimbursement. (Am. Compl. ¶¶ 53–55.) Relator therefore adequately pleads that VNSN and Dohmann knowingly caused the submission of false claims and supporting false statements.

### iii. *Materiality*

█ Defendants further argue that the allegations fail for lack of materiality. (VNSN MTD at 7.) Specifically, Defendants claim, "There is no allegation that a government agency made any payment based on the actions of Visiting Nurses or Dohmann." *Id.* That, however, is not what is required to show materiality in this Circuit.[4] Rather, the "settled" standard is that, "[u]nder the FCA, a statement or course of conduct is material if it has a natural tendency to influence agency action or is capable of influencing agency action." *United States ex rel. Sanders v. North American Bus Indus., Inc.*, 546 F.3d 288, 297 (4th Cir.2008) (internal quotation marks and citation omitted). And here, as explained above, it was fundamental to VNSN and Dohmann's alleged course of conduct that claims would be presented for federal reimbursement. (*See, e.g.*, Am. Compl. 53, 54, 67.) Such filed claims would have a natural tendency towards causing those reimbursements to

be paid. They are therefore material as alleged.

### iv. *Rule 9(b)*

VNSN next argues that the Amended Complaint fails to plead that circumstances of fraud with particularity as to the "who, what, where, when, and why," of the alleged fraud, as required by Rule 9(b). As explained in Parts III(A)(i) and III(D)(i), however, the Complaint adequately alleges that *none* of VNSN's referrals to participating providers were legitimate, and that VNSN's improper referrals "caused" false claims to be presented. VNSN is therefore aware of the alleged conduct it must defend: *all* referrals made in return for improper payments. The Amended Complaint is therefore sufficient under Rule 9(b).

### v. *Conspiracy*

FCA conspiracy claims require, again, that a relator show (1) an unlawful agreement to get a false or fraudulent claim reimbursed by the government and (2) at least one act performed in furtherance of that agreement. *Farmer*, 523 F.3d at 343. The conspirators must have "shared a specific intent to defraud the Government." *Farmer*, 523 F.3d at 343 (citation omitted). Relator does so here. He tells of a meeting, run by Dohmann, attended by representatives of the providers, where plans were laid out for an allegedly improper referral network. (Am. Compl. ¶¶ 51–57.) He tells of that network's alleged practice, following that meeting, of referring home health care patients in return for improper payments by these providers. (Am.

---

4. Defendants cite *United States ex rel. Carter v. Halliburton Co.*, No. 1:08cv1162, 2009 WL 2240331, at *7 (E.D.Va. July 23, 2009), in support of their suggested requirement of a paid claim. The citation is inapposite, first because *Carter* applied the "natural tendency" test, and second because the Court

there found materiality *before* turning to the question of whether the fraud caused the government to pay out money. *Id.* There is therefore no way to read *Carter* as requiring allegations of paid claims to prove materiality.

Compl. ¶¶ 62–66.) These allegations are sufficient to support a conspiracy claim.

\* \* \*

This Court will therefore deny VNSN and Dohmann's Motion to Dismiss.

### IV. Conclusion

For these reasons, the Court will grant Defendants MedStar and Ammirati's Motions to Dismiss and will deny the remaining Motions to Dismiss.