The UNITED STATES of America and the States of North Carolina, California, Illinois, ex rel. Scarlett Lutz, Kayla Webster, Dr. Michael Mayes and Chris Riedel, Plaintiffs,

v.

BERKELEY HEARTLAB, INC., Blue-Wave Healthcare Consultants, Inc., Quest Diagnostics Incorporated, Latonya Mallory, Floyd Calhoun Dent, III and Robert Bradford Johnson, Defendants.

CA No.: 9:14–cv–00230–RMG

(Consolidated with 9:11–cv–1593–RMG and 9:15–cv–2485–RMG)

United States District Court, D. South Carolina, Beaufort Division.

Signed March 28, 2016

Donald H. Caldwell, Jr., U.S. Attorney's Office, James F. Wyatt, III, Robert Adams Blake, Jr., Wyatt and Blake, Charlotte, NC, Elizabeth A. Strawn, Mary Chris Dobbie, Michael David Granston, Michael Edmund Shaheen, Patricia Hanower, US

Department of Justice, Steven N. Berk, Berk Law PLLC, Peter Wilson Chatfield, Phillips and Cohen, Washington, DC, Gill Paul Beck, Sr., United States Attorneys Office, Asheville, NC, James C. Leventis, Jr., Jennifer J. Aldrich, US Attorneys Office, John Daniel Kassel, John D. Kassel Law Firm, Columbia, SC, Douglas Edwards Roberts, Marc S. Raspanti, Michael A. Morse, Pamela Coyle Brecht, Pietragallo Gordon Alfano Bosick and Raspanti LLP, Philadelphia, PA, William J. Tuck, Darlington, SC, Eric James Buescher, Justin Theodore Berger, Niall P. McCarthy, Cotchett Pitre and McCarthy, Burlingame, CA, William Alexander Coates, Roe Cassidy Coates and Price, Greenville, SC, for Plaintiffs.

Christopher M. Kovach, Christopher M. Kovach Law Office, Joseph P. Griffith, Jr., Joseph P. Griffith Law Firm, Morris Dawes Cooke, Jr., Bradley Bruce Banias, Barnwell Whaley Patterson and Helms, Matthew R. Hubbell, Charleston, SC, Beattie B. Ashmore, Beattie B. Ashmore Law Office, Greenville, SC, Christopher R. Hall, Nicholas J. Nastasi, Saul Ewing LLP, Philadelphia, PA, Brian P. Dunphy, Matthew D. Levitt, Michael S. Gardener, Mintz Levin Cohn Ferris Glovsky and Popeo, Boston, MA, Hope Schwarz Foster, Mintz Levin Cohn Ferris Glovsky and Popeo, Washington, DC, for Defendants.

### ORDER

Richard Mark Gergel, United States District Court Judge

This consolidated False Claims Act ("FCA") action stems from three independently filed *qui tam* complaints. Relator Michael Mayes filed a *qui tam* complaint in June 2011, Relator Chris Riedel filed a *qui tam* complaint in December 2011, and Relators Scarlett Lutz and Kayla Webster filed a *qui tam* complaint in 2013.

This Court consolidated the three actions in June and July 2015 (Dkt. Nos. 56, 57), and the United States filed its Complaint in Intervention in August 2015. (Dkt. No. 75). Several of the defendants named in the Relators' complaints [1] settled with the United States and the relators and were dismissed from these actions before the Government filed its Complaint in Intervention.

The Government's Complaint in Intervention alleges that Defendants Berkeley, BlueWave, Johnson, Dent, and Mallory violated several provisions of the FCA. It also asserts common law claims of unjust enrichment and payment by mistake. In addition, each Relator's complaint alleges claims the Government did not raised in its Complaint in Intervention: Relator Mayes alleges that Defendant Quest violated multiple provisions of the FCA, Relator Riedel alleges that BlueWave participated in an additional scheme that violated the FCA, and Relators Lutz and Webster assert state FCA and insurance claims.

This matter now comes before the Court pursuant to several motions to dismiss. (Dkt. Nos. 88, 91, 110, 139, 143, 146, 149). Because these motions to dismiss overlap in many respects, the Court will occasionally address issues implicated by multiple motions simultaneously.

### I. Whether the FCA's First-to-File Bar Divests This Court of Jurisdiction Over the Government's Complaint in Intervention

◼ The FCA's first-to-file bar provides that "[w]hen a person brings [a FCA ac-

---

1. In addition to the initial *qui tam* complaints, Relator Mayes and Relators Lutz and Webster have filed amended complaints.

tion], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). When this provision is triggered, the court lacks subject matter jurisdiction and must dismiss the case. *See U.S. ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 181 (4th Cir. 2013), *aff'd in part, rev'd in part and remanded sub nom. Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter*, ⸺ U.S. ⸺, 135 S.Ct. 1970, 191 L.Ed.2d 899 (2015).

■ Defendants BlueWave, Dent, and Johnson argue that the FCA's first-to-file bar requires the Court to dismiss the Government's Complaint in Intervention for lack of subject matter jurisdiction. (*See* Dkt. No. 91 at 15–26). The syllogism is as follows: The Government's Complaint in Intervention is based, at least in part, on the Riedel and Lutz–Webster *qui tam* complaints. The Riedel and Lutz–Webster complaints are barred by the FCA's first-to-file bar because the Mayes complaint was pending when they were filed. Therefore, Defendants argue, the Government's Complaint in Intervention is barred by the first-to-file bar.

Even if the Court were to assume, *arguendo*, that the Riedel and Lutz–Webster complaints are subject, in their entirety, to the first-to-file bar, Defendants' argument is fundamentally flawed. The plain language of § 3730(b)(5) expressly permits the Government to intervene in an action, and a complaint is subject to the first-to-file bar only to the extent that it is based on the "same material elements of fraud as [an] earlier suit." *Carter*, 710 F.3d at 182 (*quoting United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1183 (9th Cir. 2001) (quotation marks omitted)). If, as it does here, the Government intervenes in multiple overlapping *qui tam* actions, its complaint in intervention will nec-

essarily incorporate the material elements of fraud from the earliest-filed complaints containing those elements.

Reaching any other conclusion would turn the FCA on its head. The FCA requires relators to file their *qui tam* complaints under seal. Imagine a scenario in which three relators independently file *qui tam* complaints regarding the same defendants and materially similar acts of fraud. Pursuant to the FCA, the Government receives notice of these complaints and has an opportunity to investigate the alleged fraud. The Government concludes that it is in its best interest to actively prosecute the fraud, so it purports to intervene as to all three *qui tam* actions. Under Defendants' proposed interpretation of the statute, the two later-filed complaints divest the court of jurisdiction to hear the *Government's* complaint in intervention despite the fact that the Government's complaint in intervention contains only allegations from the earliest filed *qui tam* action. This cannot be the law.

Because the FCA's first-to-file bar does not apply to the Government, the Court declines to dismiss the Government's Complaint in Intervention on these grounds.

## II. Whether the Government's FCA Claims Satisfy Rules 12(b)(6) and 9(b)

The Government's Complaint in Intervention (Dkt. No. 75) alleges three different FCA claims concerning various schemes involving Defendants Berkeley, Mallory, BlueWave, Dent, and Johnson to varying degrees. Counts I (Presentment) and II (Material False Statement) allege that all of the Defendants submitted false claims or made false statements (or caused false claims or statements to be submitted or made) in violation of §§ 3729(a)(1)(A) and (B), respectively. Count III (Conspiracy) alleges that all of the Defendants ex-

cept for Berkeley conspired to enter into one or more conspiracies to violate §§ 3729(a)(1)(A) and (B), in violation of § 3729(a)(1)(C). Defendants Berkeley (Dkt. No. 110), Mallory (Dkt. No. 88), and BlueWave, Dent, and Johnson (Dkt. No. 91) have all moved to dismiss the Government's Complaint in Intervention for failure to satisfy Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. After providing an overview of the schemes alleged in the Government's complaint, the Court will analyze each count in turn.

## A. Background

The Government alleges that Berkeley concocted and implemented three separate schemes that violated the FCA: (1) the Processing & Handling ("P&H") Kickback Scheme, (2) the Unnecessary Testing Scheme, and (3) the Copayment Waiver Scheme. The Government also alleges Defendants BlueWave, Dent, Johnson, and Mallory engaged in their own variations of these three schemes and also concocted and implemented (4) the Marketing Kickback Scheme. The basic contours of each scheme, as alleged in the complaint, are as follows:

### 1. The P&H Kickback Scheme

Berkeley implemented a nationwide scheme to pay physicians and physician groups a kickback disguised as a "draw" or "processing and handling" fee. (Dkt. No. 75 at ¶ 74). Berkeley agreed to pay physicians a fee in excess of the amount authorized by applicable regulations for each referral they made for blood testing. (*Id.* at ¶ 75). The purpose of paying this excess fee, or kickback, was to induce those physicians to make more referrals and order more blood tests. (*Id.* at ¶ 14). Berkeley, in turn, submitted claims for reimbursement to Medicare and TRICARE. (*Id.*). As a result of these referrals and blood tests,

Berkeley received roughly $96 million in Medicare and TRICARE reimbursements between 2005 and 2011. (*Id.* at ¶¶ 80–84). These reimbursements were improper (*i.e.*, false) because the kickbacks constituted "illegal remunerations" under the Anti-Kickback Statute ("AKS"), § 42 U.S.C.a–7b. (*Id.* at 2). Berkeley knew that the payments were improper. (*Id.* at ¶ 78)

Defendant Mallory worked at Berkeley as the Senior Manager of Lab Operations. (*Id.* at ¶ 26). Defendants Dent and Johnson worked as sales representatives. (*Id.* at ¶¶ 22–23). In 2008, Mallory left Berkeley to form HDL, a laboratory blood testing company. (*Id.* at ¶ 26). In 2009, Dent and Johnson left Berkeley to form BlueWave, which functioned as the sales and marketing arm of HDL. (*Id.* at ¶ 21–23).

In 2010, Mallory, on behalf of HDL, and Dent and Johnson, on behalf of BlueWave, executed a sales agreement. (*Id.* at ¶¶ 101–07). Dent and Johnson directly offered the P&H fees to physicians, talked up the P&H fees, and trained their sales representatives to talk up the P&H fees as well. (*See, e.g. id.* at ¶¶ 212–21). Over the process of this relationship, Mallory occasionally approved higher packaging and handling fees on a case-by-case basis to induce physicians to switch to HDL from their competitors. (*Id.* at ¶ 206–207). Mallory also authorized the direct payment of some physicians, rather than paying their practices. (*Id.* at ¶ 211).

The effect of the 2010 agreement was a supercharged version of the P&H Kickback Scheme initially implemented by Berkeley. HDL submitted its claims for reimbursement to Medicare and TRICARE. As a result of BlueWave's sales efforts, HDL received approximately $333 million from Medicare and TRICARE reimbursements between October 2009 and July 2014. (*Id.* at ¶ 190). Mallory's salary and bonuses were directly tied to HDL's

profits. (*Id.* at ¶ 191). BlueWave, Dent, and Johnson received approximately $223 million in remuneration that was meant to induce them to arrange for or recommend the purchasing or ordering of HDL's tests that would be reimbursed by Medicare and TRICARE. (*Id.* at ¶ 192). In addition, BlueWave, Dent, and Johnson received more than $18 million from Singulex commission payments.

Defendants used the fees to induce physicians to order more tests. (*Id.* at ¶¶ 4–7). Defendants Mallory, Dent, Johnsons, and BlueWave knew that the P&H fees were illegal and tried to disguise them by calling them "processing fees" rather than "draw fees." (*Id.* at ¶ 209). Defendants received emails from physicians and attorneys saying that the P&H fees were illegal kickbacks. (*Id.* at ¶ 210).

Each claim for Medicare or TRICARE reimbursement for services that were tainted by these P&H Kickbacks constitute a FCA violation. (*Id.* at ¶¶ 8–9).

### 2. The Unnecessary Testing Scheme

All Defendants encouraged physicians to order tests that were medically unnecessary. (*Id.* at ¶¶ 5, 9, 172–76, 225). In addition to regular patient tests, Defendants BlueWave, Johnson, Dent, and Mallory encouraged unnecessary genetic testing on patient blood samples held by HDL in storage. (*Id.* at ¶ 200–03). These tests were subsequently submitted to Medicare and TRICARE for reimbursement. However, they were false claims because they were not medically necessary tests and Medicare and TRICARE only cover medically necessary care. (*Id.* at ¶¶ 5, 9, 172–76, 225).

### 3. The Copayment Waiver Scheme

Berkeley improperly waived TRICARE's copays and deductibles to induce the physicians of TRICARE patients to order more tests. (*Id.* at ¶ 3). Service pro-

viders like Berkeley, cannot, as a matter of law, waive required TRICARE copays and deductibles. (*Id.* at ¶ 68). Defendants Mallory, Johnson, Dent, and BlueWave advertised HDL's waiver of copayments and deductibles for all patients. Defendants Mallory, Johnson, Dent, and BluWave also offered to waive—and did waive—TRICARE copays and deductibles to induce TRICARE patients to agree to testing. (*Id.* at ¶ 183). These waivers constituted illegal remuneration in violation of the AKS, and submitting these claims for reimbursement constituted FCA violations. (*Id.* at ¶ 11).

### 4. The Marketing Kickback Scheme

As discussed above in the P&H Kickback Scheme, Dent and Johnson, on behalf of BlueWave, and Mallory, on behalf of HDL, entered into a sales agreement wherein HDL paid BlueWave, Johnson, and Dent a kickback in exchange for Blue-Wave sales representatives arranging for and recommending that physicians order tests that were reimbursed by Medicare and TRICARE. By the terms of the sales agreement, BlueWave agreed to "use its best efforts to maximize specific sales goals," (*id.* at ¶ 104), and HDL agreed to pay physicians between $18—$21 in processing & handling fees, (*id.* at ¶ 105). HDL also agreed to pay BlueWave a commission based on "the revenue collected by HDL from sales." (*Id.* at ¶ 107).

### B. Count I: Presentment (31 U.S.C. § 3729(a)(1)(A))

To state a cause of action under § 3729(a)(1)(A), the Government must allege that the Defendants "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval." Courts construe the phrase "false or fraudulent claim ... broadly to reach all types of fraud, without qualification, that

might result in financial loss to the Government[.]" *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 634 (4th Cir. 2015) (internal citations and quotation marks omitted). A "presentment claim arises when a claim for payment that is submitted to the government rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F.Supp.3d 104, 122 (D.D.C. 2014) (internal quotation mark omitted); *accord Triple Canopy, Inc.*, 775 F.3d at 634–35 (adopting implied certification). This is also known as implied false certification. *Id.*

■ Here, the Government alleges that implied false certification occurred each time Berkeley or HDL submitted tainted forms for reimbursement by Medicare and TRICARE because the request contained the implied certification that it was appropriate for the Government to pay for the services rendered. However, the above-mentioned schemes rendered the services non-reimbursable due to violations of the AKS.

■ To provide additional background for the Government's allegations, the AKS, in relevant part, makes it illegal to "knowingly and willfully" arrange for or provide remuneration as an inducement for federal program business. 42 U.S.C. § 1320a–7b(b). Any claim tainted by an AKS violation constitutes a false or fraudulent claim.

42 U.S.C. 1320a–7b(g) ("[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA.]"); *see United States v. Rogan*, 517 F.3d 449, 452–53 (7th Cir. 2008) (holding that all claims submitted by defendant were false because they were acquired by kickback); *see also U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 386 (4th Cir. 2015) (holding defendant was "knowingly asking the government to pay an amount that, by law, it could not pay" each time it submitted a claim tainted by a violation of the analogous Stark Law); *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09–22253–CIV, 2013 WL 1289260, at *4 (S.D. Fla. Mar. 27, 2013) ("Thus, if a healthcare provider requests payment from Medicare notwithstanding the fact that the transactions underlying the claims were in violation of the Anti–Kickback Statute and Stark, the healthcare provider has committed a fraud against the government.").[2] To *prove* a violation of the AKS, the Government will need to show that Defendants acted with a purpose to commit a wrongful act. *See, e.g., United States v. McClatchey*, 217 F.3d 823, 829 (10th Cir. 2000). But it need only allege a purpose to commit a wrongful act to survive a 12(b)(6) motion to dismiss.

The Government's presentment allegations contain all of the elements of a presentment claim based on a theory of implied false certification. With regard to

2. In briefing related to the multiple pending motions to dismiss, some Defendants argue that the 2010 amendment that made it clear that a claim resulting from an AKS violation was a false claim operated only in a prospective nature. (*See, e.g.,* Dkt. No. 146–1 at 17). However, this Court finds that the weight of authority supports the conclusion that the 2010 amendment adding 42 U.S.C. 1320a–7b(g) was merely a clarification of the law; claims tainted by AKS violations constitute false claims for the purposes of the FCA re- gardless of whether the violation occurred before or after the 2010 amendment. *See, e.g., U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 312 n.19 (3d Cir. 2011) (holding that the 2010 amendment was a clarification); *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 812 F.Supp.2d 39, 52 (D. Mass. 2011) ("The amendment's legislative history, however, evinces Congress' intent to clarify, not alter, existing law that claims for payment made pursuant to illegal kickbacks are false under the False Claims Act.").

Berkeley, the complaint clearly alleges that Berkeley knowingly presented false claims and identifies the specific claims and why those claims are alleged to be false. The allegedly false claims include the entire universe of claims that Berkeley submitted that were tainted by P&H kickbacks, all claims for medically unnecessary services, and all claims submitted to TRICARE for which a copay or deductible was waived.[3] Identifying each specific claim from this universe is unnecessary, but the Government does specifically identify several physicians who allegedly received P&H kickbacks and one physician who was encouraged to order panels of medically unnecessary tests for his patients.

■ With regard to Mallory, Dent, Johnson, and BlueWave, the complaint clearly alleges that they *caused* false claims to be presented, again, on a theory of implied false certification. Here, the universe of false claims includes HDL claims that were tainted by P&H kickbacks, all HDL claims for medically unnecessary services, all HDL claims submitted to TRICARE for which a copay or deductible was waived, and, in the case of Dent, Johnson, and BlueWave, similarly tainted Singulex claims. Taking the allegations as true and applying the traditional tort principles of proximate causation, *see U.S. ex rel. DeCesare v. Americare In Home Nursing,* 757 F.Supp.2d 573, 589 (E.D. Va. 2010), the Court finds that HDL's and Singulex's submission of false claims was the necessary, foreseeable, and obvious consequence of these Defendants' participation in the abovementioned schemes.

■ The Government's presentment allegations are also sufficient to satisfy Rule 9(b). When alleging fraud, as the Government does here, the complaint "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* To meet this standard, the complaint must describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999)). In other words, the complaint must describe the "who, what, when, where, and how of the alleged fraud." *Id.* (quoting *United States ex rel. Willard v. Humana Health Plan of Texas Inc.,* 336 F.3d 375, 384 (5th Cir. 2003) (internal quotation mark omitted)). And finally, "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison,* 176 F.3d at 784.

The complaint describes each of the four alleged schemes in detail, identifies some

---

**3.** Defendant Berkeley argues that the waiver of copays and deductibles does not constitute remuneration within the context of the AKS—and therefore cannot be the basis for a FCA violation—because "there is no allegation that physicians make any payments to labs for tests to be performed." (Dkt. No. 110–1 at 19–20). However, the appropriate test for whether the waiver of a copay constitutes remuneration is whether the complaint has alleged that at least one of the purposes of the waiver was to induce patient referrals. *See U.S. ex rel. Sharp v. E. Oklahoma Orthopedic Ctr.,* No. 05–CV–572–TCK–TLW, 2009 WL 499375, at *25 (N.D. Okla. Feb. 27, 2009). The complaint satisfies that requirement by alleging that Berkeley waived copays "with the intent to induce physician referrals." (Dkt. No. 75 at pp. 1–2, ¶¶ 3–4).

physicians who received P&H kickbacks, recounts conversations by sales representatives, and specifies particular genetic testing that is medically unnecessary for the vast majority of the population, yet still included in the panels Defendants offered to physicians. It alleges the who, what, where, when (in terms of a timeframe), and how of the fraud. It also provides Defendants with adequate notice of prediscovery facts to prepare a defense at trial.

Defendants Mallory, Johnson, Dent, and BlueWave specifically argue that the complaint fails to "prove" scienter because the interpretation of AKS rules and regulations were unsettled. (*See* Dkt. Nos. 91 at 30, 88–1 at 17–18). Even if it were true that the interpretation of AKS rules were unsettled, the Court finds this argument to be misplaced. At this stage the Government need not *prove* scienter, it need only allege it. It has more than met Rule 9(b)'s requirement by alleging that (1) a purpose of the P&H fees was to induce referrals (Dkt. No. 75 at ¶¶ 154, 159–60, 164–65, 181–83, 197–99); (2) Defendants knew of the illegality of the P&H fees and tried to disguise them by calling them P&H fees instead of draw fees (*id.* at ¶¶ 78, 209 ("one word makes it legal the other illegal")); and (3) "Defendants received emails from physician practices and their attorneys asserting that the processing and handling fees were kickbacks," (*id.* at ¶ 210).

Defendant Berkeley also argues that the complaint fails to adequately plead scienter as to the FCA and AKS because it does not identify individuals at the defendant corporation who submitted false claims or records. (Dkt. No. 110–1 at 21). This argument is both false and a nonstarter. As a preliminary matter, the complaint identifies actions that Defendants Mallory, Johnson, and Dent took while they were employees at Berkeley that implicated the

P&H Kickback Scheme. (*See* Dkt. No. 75 at ¶ 6 (identifying the individuals as former Berkeley employees), ¶ 151 (citing Mallory's role in rationalizing the P&H Fees through a time and motion study), ¶ 152 (explaining how Johnson and Dent promoted Berkeley's P&H fees to generate more referrals)). Furthermore, neither the FCA nor Rule 9(b) require the identification of individuals within a defendant corporation. The FCA imposes liability on "[a]ny *person who*" commits certain violations, 31 U.S.C. § 3729, and for the purposes of the FCA, *person* includes corporations. *See Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 125, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) ("While § 3729 does not define the term 'person,' we have held that its meaning has remained unchanged since the original FCA was passed in 1863. [ *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 783 n. 12, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).] There is no doubt that the term then extended to corporations . . . .").

### C. Count II: Material False Statement (31 U.S.C. § 3729(a)(1)(B))

To state a cause of action under 31 U.S.C. § 3729(a)(1)(B), the Government must allege that Defendants "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim." Any documentation that contains an implied certification is false. *See United States v. Triple Canopy, Inc.*, 775 F.3d 628, 635 (4th Cir. 2015) (*citing United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010)); *see also* (*U.S., ex rel. Hood v. Satory Glob., Inc.*, 946 F.Supp.2d 69, 85 (D.D.C. 2013)) (false certification satisfied false statement requirement). Any documentation (that is, any record or statement) that must be

submitted to Medicare or TRICARE for reimbursement is material because it has "a natural tendency to influence, or be capable of influencing, the Government's decision to pay." *See United States v. Triple Canopy, Inc.*, 775 F.3d 628, 634 (4th Cir. 2015) (quoting 31 U.S.C. § 3729(b)(4))(internal quotation marks omitted).

■ The Government alleges that due to their participation in the four schemes outlined in the complaint, Defendants knowingly made (or caused to be made) "false bills, requests for reimbursement, requisition forms, and records of services ... that were material to the payment or approval of claims by federal programs," and that those services were either tainted by illegal kickbacks, medically unnecessary, or both. (Dkt. No. 75 at ¶¶ 228–32).

With regard to Berkeley, the complaint adequately alleges that it knowingly made and/or used (and also caused to be used) false records material to a false claim. The Complaint clearly alleges that certain forms and records are required for Medicare and TRICARE reimbursement, respectively, and that those documents are false because they contain an implied certification of compliance with the applicable requirements. (Dkt. No. 75 at ¶¶ 54, 57). The complaint also alleges that Berkeley knowingly made and/or used false records and caused false records to be made and/or used. (*Id.* at p. 1, ¶¶ 3–4). As discussed above, cause in the sense of the statute means proximate cause. The creation of false records—that is, false TRICARE patient records—are the necessary, foreseeable, and obvious consequence of offering to waive and actually waiving TRICARE patients' copays.

With regard to Defendants Mallory, Johnson, Dent, and BlueWave, the complaint clearly alleges that they *caused* false records material to false claims to be made and/or used. As discussed above, the creation of false records (e.g., false Medicare forms) is the necessary, foreseeable, and obvious consequence of Defendants' improper inducements such as providing kickbacks or promoting medically unnecessary testing.

The Court is also satisfied that the Government's material false statement allegations also satisfies Rule 9(b)'s requirement. The complaint identifies the universe of false records and statements (*i.e.*, Medicare forms and TRICARE patient records with false implied certification); establishes the records' materiality to false claims (*i.e.*, they are required by the programs for payment); and highlights how each Defendant's actions either made the records, used the records, or proximately caused such records to be made or used. Again, the complaint more than adequately alleges the who, what, where, when, and how of the fraud.

### D. Count III: Conspiracy (31 U.S.C. § 3729(a)(1)(C))

■ To state a cause of action under 31 U.S.C. § 3729(a)(1)(C), the Government must allege that Defendants Mallory, Dent, Johnson, and BlueWave "conspire[d] to commit a violation of [§§ 3729(a)(1)(A) or (B)]." The complaint must allege the existence of an agreement to violate the FCA and at least one act performed in furtherance of that agreement. *See U.S. ex rel. DeCesare v. Americare In Home Nursing*, 757 F.Supp.2d 573, 584 (E.D. Va. 2010).[4]

4. For claims before May 20, 2009, the Government must specifically allege that Defendants (1) "conspire[d] to defraud the Government by getting a false or fraudulent claim paid," 31 U.S.C. § 3729(a)(3) (2000), and (2) "agreed to make use of the false record or

The complaint alleges the existence of an agreement between Defendants to violate the FCA: the April 2010 sales agreement discussed above in the P&H Kickback Scheme and Marketing Kickback Scheme, which *caused* false claims to be presented to the Government. All of the acts undertaken as a part of those schemes—for example, selling medically unnecessary tests, paying P&H fees to physicians, and paying commissions for test sales—qualify as acts in furtherance of the agreement. The Government clearly states a FCA conspiracy cause of action, and, because the conspiracy claim is based on the underlying substantive claims, the Court finds that the Government has satisfied Rule 9(b)'s specificity requirements.

Defendants BlueWave, Johnson, and Dent argue that the intracorporate conspiracy doctrine bars the conspiracy claims, but this argument lacks merit. The intracorporate conspiracy doctrine stands for the proposition that because a conspiracy requires two or more persons, a corporation cannot conspire with its agents. *Buschi v. Kirven,* 775 F.2d 1240, 1251 (4th Cir. 1985). The conspiracy that the Government alleges, however, is not only between BlueWave, Johnson, and Dent. It also includes HDL and Mallory. HDL and BlueWave are separate entities, a point underscored by the terms of the April 2010 sales agreement. (*See* Dkt. No. 75 at ¶ 106).

But even if HDL, BlueWave, Johnson, and Dent were all considered to be part of the same corporation, the intracorporate conspiracy doctrine would still not apply. The complaint alleges that Blue-Wave, Johnson, and Dent were able to collect more than $230 million in commissions based on the deal, and the intracorporate conspiracy does not apply when parties have "independent personal stake[s] in achieving the illegal objectives of the corporation." *Walters v. McMahen,* 795 F.Supp.2d 350, 358 (D. Md. 2011), *aff'd,* 684 F.3d 435 (4th Cir. 2012) (*quoting Greenville Publ'g Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir. 1974) (internal quotation marks omitted)).

For the abovementioned reasons, the Government's complaint adequately alleges claims under 31 U.S.C. §§ 3729(a)(1)(A), (B), and (C).

### III. Whether the Government's Common Law Claims Should Be Dismissed

In addition to FCA claims, the Government's complaint includes two common law causes of action—payment by mistake and unjust enrichment. Defendants Mallory, BlueWave, Dent, and Johnson seek to dismiss these claims for various reasons. (Dkt. Nos. 88–1 at 25–27, 91 at 32–34).

As a preliminary matter, the Federal Rules of Civil Procedure permit pleading in the alternative. Fed. R. Civ. P. 8(d)(3). Furthermore, "common law actions are available to the government to supplement those remedies found in federal statutes, as long as the statute does not expressly abrogate those rights. This principle has been affirmed and re-affirmed many times." *United States v. Moffitt, Zwerling & Kemler, P.C.,* 83 F.3d 660, 667 (4th Cir. 1996) (collecting cases). Because the FCA did not expressly abrogate the Government's ability to bring actions such as payment by mistake and unjust enrichment, the Government may bring equitable or common law claims in the alterna-

statement to achieve this end." *Allison Engine Co. v. United States ex rel. Sanders,* 553 U.S. 662, 665, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008). The amended FCA conspiracy statute applies to any substantive FCA claim.

tive. *Cf. U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015) (disallowing recovery for common law claims because the United States obtained treble damages and penalties on the FCA claims it pled in the alternative).

BlueWave, Dent, and Johnson argue that the Court should not permit the Government to plead in the alternative because the FCA claims are an adequate remedy at law. To support this proposition, they cite *Regional Airport Authority of Louisville v. LFG, LLC*, a Sixth Circuit case in which the plaintiff sought equitable indemnification that hinged on the resolution of a statutory claim, 460 F.3d 697, 711 (2006). Unlike that case, however, the equitable claims here do not "hinge" on the resolution of the statutory claims because payment by mistake and unjust enrichment provide standalone causes of action.

 Mallory argues that the claims should be dismissed because "the government did not elect to intervene against defendants with regard to these claims." (Dkt. No. 88–1 at 26). This argument is a red herring, however, because "a relator in a *qui tam* FCA action does not have standing to assert common law claims based upon injury sustained by the United States." *U.S. ex rel. Rockefeller v. Westinghouse Elec. Co.*, 274 F.Supp.2d 10, 14 (D.D.C. 2003), *aff'd sub nom. Rockefeller ex rel. U.S. v. Washington TRU Sols. LLC*, No. 03–7120, 2004 WL 180264 (D.C. Cir. Jan. 21, 2004).

 Mallory next argues that unjust enrichment is inapplicable as a matter of law because she did not directly receive money from the Government. Instead she received "compensation as CEO" of HDL. (Dkt. No. 88–1 at 27). This argument is also without merit.

The Government alleges that Medicare and TRICARE paid HDL over $325 mil-

lion for improper tests, that Mallory was unjustly enriched by more than $25 million based on HDL's receipt of that money, and that Mallory knew of and participated in the scheme. (Dkt. No. 75 at ¶¶ 26, 119, 190–91, 243–245). The Government has alleged that "Mallory's salary and bonuses were directly tied to HDL's profits." (Dkt. No. 75 at ¶ 191). The Government cites a Fourth Circuit case involving unjust enrichment for the proposition that because Mallory's salary consisted of money neither she nor HDL was entitled to, the Government has a reasonable expectation of repayment and Mallory should expect to be required to refund it. *See Provident Life & Acc. Ins. Co. v. Waller*, 906 F.2d 985, 994–95 (4th Cir. 1990) ("[T]hree elements encompass the equitable remedy of unjust enrichment and quasi-contract: the plaintiff must show that (1) he had a reasonable expectation of payment, (2) the defendant should reasonably have expected to pay, *or* (3) society's reasonable expectations of person and property would be defeated by nonpayment.") (emphasis added). This Fourth Circuit case involved "the federal common law remedy of unjust enrichment," *id.* at 995, and the Government has clearly alleged a claim for unjust enrichment under the federal common law.

For the abovementioned reasons, the Court denies Defendants' motions to dismiss the equitable claims of payment by mistake and unjust enrichment.

## IV. Statute of Limitations

Defendant Berkeley has asserted that the statute of limitations bars certain claims against it filed under the FCA and common law. (*See* Dkt. No. 110–1 at 44–45). The initial complaint against Berkeley was filed on June 30, 2011. The statute of limitations for FCA and federal common law claims is six years. *See* 31 U.S.C. § 3731(b)(1); 28 U.S.C. § 2415. According-

ly, any claims for damages arising before June 30, 2005 are barred.

### V. Whether the FCA's First-to-File Bar Divests This Court of Jurisdiction Over the Riedel Complaint or Necessitates the Dismissal of Riedel as a Plaintiff

Defendant BlueWave argues that this Court should dismiss the Riedel Complaint because it is precluded by the first-to-file bar. (Dkt. No. 139). To determine whether the first-to-file bar applies to the Riedel complaint, the Court must determine whether it is based on the "same material elements of fraud as the [earlier-filed Mayes complaint]." *U.S. ex rel. Carter v. Halliburton Co.*, 710F.3d 171, 182 (4th Cir. 2013), *aff'd in part, rev'd in part and remanded sub nom. Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter*, —— U.S. ——, 135 S.Ct. 1970, 191 L.Ed.2d 899 (2015).

The Riedel complaint alleges that Blue-Wave played a role in five different fraudulent schemes: (1) it illegally waived private insurance copays; (2) it waived private insurance deductible payments to induce business; (3) it used inflated "packaging fees" to induce referral of Medicare business; (4) it paid speaking fees to physicians who signed up to be a part of its "Speaker's Bureau," and (5) it billed for medically unnecessary tests. Riedel correctly concedes that the first-to-file bar applies to his allegations of medically unnecessary billing because the earlier-filed Mayes complaint contained similar allegations. (Dkt. No. 156 at 14). The Court also finds that Riedel's allegations regarding inflated "packaging fees" encompass the same material elements of the allegations involving inflated "drawing fees" contained in the Mayes complaint. (*Compare* Dkt. No. 91–2 at ¶ 24 ("Defendants pay referring physicians draw and 'packaging' fees that far exceed the [Medicare amount, standard industry practice, and fair market value.]") (Riedel Complaint), *with* 91–1 at ¶ 54 (alleging that LiposScience, Berkeley, and Blue-Wave engaged in a scheme to pay a kickback disguised as a "drawing fee") (Mayes Complaint)). Accordingly, the first-to-file bar also applies to Riedel's allegations of inflated packaging fees.

Defendant BlueWave argues that because the Mayes complaint outlined the alleged P&H Kickback Scheme, the first-to-file bar should apply to the Riedel complaint in its entirety because the Government "had enough information to discover any related fraud." (Dkt. No. 164 at 2) (quoting *U.S. ex rel. Szymoniak v. ACE Sec. Corp.*, No. 0:13–CV–00464–JFA, 2014 WL 1910876, at *6 (D.S.C. May 12, 2014), appeal dismissed (Aug. 11, 2014)). The Court does not find this argument to be persuasive.

The alleged frauds in the Mayes and Riedel complaints are related in the sense that they were allegedly perpetrated to induce physicians to order more tests. But Riedel did more than simply make an "insignificant factual variations to allege what is essentially the same fraudulent scheme already made known to the government." *U.S. ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 182 (4th Cir. 2013) (quoting *United States ex rel. Folliard v. Synnex Corp.*, 798 F.Supp.2d 66, 73 (D.D.C. 2011)). Riedel did not "simply add[ ] factual details or geographic locations to the essential or material elements of a fraud claim against the same defendant described in a prior complaint." *U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009). Although the Mayes Complaint also identifies BlueWave as a defendant, Riedel provided the Government with information on entirely different fraudulent schemes. No reasonable read-

ing of the Mayes Complaint would have informed the Government of the need to investigate whether BlueWave was paying speaker's fees to physicians as a kickback or waiving insurance copays and deductibles. *See U.S. ex rel. Galmines v. Novartis Pharm. Corp.*, No. CIV.A. 06–3213, 2013 WL 2649704, at *10 (E.D. Pa. June 13, 2013), *on reconsideration in part*, No. CIV.A. 06–3213, 2013 WL 5924962 (E.D. Pa. Nov. 5, 2013) (holding that the first-to-file rule did not bar complaint involving same defendants where first-filed complaint did not put Government on notice of a separate fraudulent scheme).

The Government partially intervened regarding the waiver of insurance copays and deductibles. (*See* Dkt. No. 75 at ¶¶ 3, 7, 68, 154, 183–84, 224). Accordingly, the Government's complaint controls insofar as the TRICARE patient waivers are concerned. *See* 31 U.S.C. § 3730(c)(3) ("If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action. . . ."). Because the Government elected not to intervene with regard to Riedel's allegations involving the payment of speaker's fees or the waiver of private insurance copays and deductibles, he has "the right to conduct the action." 31 U.S.C. § 3730(c)(3). Therefore, the first-to-file bar neither divests the Court of jurisdiction over the Riedel Complaint nor requires the Court to dismiss Riedel as a plaintiff.

### VI. Whether The Riedel Complaint Satisfies Rules 8, 9(b), and 12(b)(6)

█ Defendant BlueWave contends that Riedel's complaint fails to plead fraud with the specificity and particularity required by Rules 8, 9(b), and 12(b)(6). The Court agrees, at least in part.

To satisfy Rule 12(b)(6) of the Federal Rules of Civil Procedure, the complaint must "state a claim upon which relief can be granted." Riedel's complaint states four separate FCA causes of action: (1) Presentment of False Claims (§ 3729(a)(1)(A)); (2) Making False Records or Statements (§ 3729(a)(1)(B)); (3) Conspiracy (§ 3729(a)(1)(C)); and (4) Retention of Proceeds to Which Not Entitled (§ 3729(a)(1)(G)). The Court has some concern regarding whether the complaint adequately states each cause of action. But assuming, *arguendo*, that Riedel's complaint satisfies Rule 12(b)(6), it falls short of Rule 9(b)'s particularity requirement.

As discussed above, the complaint may allege knowledge generally, but it "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To meet this standard, the complaint must describe the "who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 384 (5th Cir. 2003) (internal quotation mark omitted)). Although the Government's Complaint in Intervention provides the Court with some of the possible context for Riedel's allegations, reading the Riedel complaint in isolation does not provide the Court with enough of the who, what, when, where, and how of the alleged fraud to satisfy Rule 9(b).

Beginning with the "who," BlueWave is the only one of the three defendants named in the Riedel complaint who is still a party to this action. With scant exceptions, the complaint refers to Defendants in the plural. This would not be problematic if BlueWave were also a testing laboratory or diagnostic company like HDL and Singulex, respectively. But because the Riedel complaint instead alleges that BlueWave is a marketing and sales service provider, the numerous references to the

actions of "Defendants" make Blue Wave's role in the alleged fraud unclear.

Consider, for example, the following excerpts from the Riedel complaint, which address the three allegedly fraudulent schemes to which the Government did not intervene:

- Defendants promise physicians that they will not collect co-payments, as long as the physicians send all of their lipid-related business—including Medicare business—to the Defendants' laboratories. (Dkt. No. 91–2 at ¶ 17, ¶ 18 (same, but covering deductibles instead of copays)).

- The fourth form of kickbacks paid by Defendants are "speaking fees" paid to physicians who sign up to be part of Defendants' "Speakers Bureau." In exchange for speaking at conferences once or twice a year, referring physicians are paid thousands of dollars by Defendants. The fees paid by Defendants ... are intended as illegal remuneration to induce the referral of physicians' Medicare and other business. (Dkt. No. 91–2 at ¶ 25).

If the Court were to replace "Defendants" with "BlueWave" in the first excerpt (and in all related paragraphs) the how and what of the alleged frauds involving copay and deductible waivers are unclear. The Complaint makes no allegations that BlueWave collects co-payments or deductibles, has laboratories, or receives Medicare payments. Conducting the same exercise with the speaking fee fraud allegations provides a somewhat clearer picture of BlueWave's alleged involvement. However, it is still unclear how BlueWave benefits from the alleged fraud or who, exactly, is involved in this Speakers Bureau.

"A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784. Those assurances are not present here. Accordingly, Relator Riedel's non-intervened FCA claims are dismissed without prejudice. The Court grants Riedel's request to amend the complaint, and he has 14 days from the date of this order to submit an amended complaint.

## VII. Whether the FCA's first-to-file bar divests this Court of Jurisdiction Over the Lutz–Webster Second Amended Complaint

Defendants Mallory, Dent, Johnson, and BlueWave argue that the Court lacks jurisdiction over the Lutz–Webster Second Amended Complaint due to the FCA's first-to-file bar. (Dkt. Nos. 91 at 15–16, 143–1 at 14, 149–1 at 5). Again, the determinative question is whether the material elements of fraud contained in the Lutz–Webster Complaint are the same as those contained in any related actions that were pending when it was filed.

The Lutz–Webster Second Amended Complaint generally alleges that (1) Health Diagnostic Laboratory and Singulex provided improper inducements for patient referrals for laboratory tests, (2) these tests were medically unnecessary, and (3) BlueWave was involved in the scheme. (Dkt. No. 40–1 at 43–66). By the time Relators Lutz and Webster filed their complaint, Relators Mayes and Riedel had each filed complaints. Among other things, the Mayes and Riedel complaints outlined the allegations of kickbacks through draw fees, co-pay waivers, packaging fees, and speaking fees. But neither the Mayes nor the Riedel complaint named Dent, Johnson, or Mallory as defendants, and the Lutz–Webster Complaint was the first to

articulate the alleged relationship between Johnson, Dent, and Mallory.

To be sure, a portion of the Lutz–Webster Second Amended Complaint covered the same material elements of the fraud allegations involving BlueWave as the Mayes and Riedel Complaints. To that extent, the allegations of fraud involving BlueWave are precluded by the first-to-file bar.[5] Unlike the Mayes and Riedel complaints, however, the Lutz–Webster Second Amended Complaint identified Defendants Mallory, Dent, and Johnson and articulated their alleged roles in the various schemes. The addition of these Defendants prevent the first-to-file bar from barring the Lutz–Webster Second Amended Complaint in its entirety.

■ The FCA precludes anyone but the Government from "bring[ing] a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). To determine whether the first-to-file bar applies, the Fourth Circuit has adopted the "same material elements" test. *Carter*, 710 F.3d at 182–83 (joining the Third, Fifth, Sixth, Ninth, Tenth, and D.C. circuits). Applying this test, a later-filed action is not based on the facts of a pending action when it identifies a new defendant who is not a subsidiary of an already-named defendant. *See In re Nat. Gas Royalties Qui Tam Litig. (CO2 Appeals)*, 566 F.3d 956, 962 (10th Cir. 2009) ("The identity of a defendant constitutes a material element

of a fraud claim. . . ."); *see also U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 218–19 (D.C. Cir. 2003) (holding that first-to-file bar applied to when primary difference was named subsidiaries). Here, because the Lutz–Webster Complaint contains *different* material elements of fraud than the pending action—that is, because their complaint identifies new defendants who are not subsidiaries of already-named defendants—the first-to-file bar does not apply to the allegations involving Defendants Mallory, Dent, or Johnson.

Because the Lutz–Webster Second Amended Complaint contains claims that are not precluded by the FCA's first-to-file bar, the Court retains jurisdiction over the claims to which the Government intervened and the state law claims raised in the complaint that are not otherwise jurisdictionally deficient.

### VIII. Whether this Court has Jurisdiction Over the North Carolina FCA Claims Contained in the Lutz–Webster Second Amended Complaint

■ Like the Federal FCA, the North Carolina FCA contains a first-to-file bar. Unlike the Federal FCA, however, the North Carolina FCA's first-to-file bar applies to all pending federal and state FCA actions:

---

**5.** With respect to the federal FCA claims, the practical effect of a partial first-to-file bar on the Lutz-Webster Second Amended Complaint is negligible because the Government intervened on the allegations against BlueWave contained in the previously filed Mayes and Riedel complaints. When the Government intervenes, the claims in its complaint in intervention (or modification of a relator's complaint) become the operative claims. *See* 31 U.S.C. § 3730(c)(1) ("If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action,

and shall not be bound by an act of the person bringing the action."); *U.S. ex rel. Feldman v. City of New York*, 808 F.Supp.2d 641, 648 (S.D.N.Y. 2011) ("[W]hen the Government decides to intervene in a qui tam action, the Government's claims become the operative claims insofar as they are duplicative of those of the relator."). The more salient effect is that will be no relator recovery related to claims for which Relators Lutz and Webster were not the first to file. *See U.S. ex rel. Merena v. Smithkline Beecham Corp.*, 114 F.Supp.2d 352, 364 (E.D. Pa. 2000).

When a person brings an action *under this subsection, the federal False Claims Act,* 31 U.S.C. § 3729 *et seq., or any similar provision of law in any other state,* no person other than the State may . . . bring a related action based on the facts underlying the pending action. . . .

N.C. Gen. Stat. Ann. § 1–608(b)(5) (emphasis added). Defendants Dent, Johnson, and BlueWave argue that the North Carolina FCA's first-to-file bar requires the dismissal of Relators Lutz and Webster's North Carolina FCA claim. (Dkt. No. 149). The Court partially agrees.

Again, the Court must determine whether the Lutz–Webster Complaint covers the "same material elements of fraud as the [earlier-filed Mayes and Riedel complaints]." *See Carter,* 710 F.3d at 182. As discussed above, Lutz and Webster's Second Amended Complaint contains claims against BlueWave that are based on the same material elements of fraud as a pending federal FCA action against Blue-Wave—that is, that BlueWave engaged in a scheme with HDL and Singulex to induce referrals for medically unnecessary lab tests through the payment of improper fees. Accordingly, the Court has no jurisdiction over the North Carolina FCA claims against BlueWave.

█ By contrast, the North Carolina FCA claims against Defendants Dent, Johnson, and Mallory are not based on the same material elements of fraud of any pending action. As discussed above, a nonsubsidiary defendant's identity constitutes a material element of fraud. Because Lutz and Webster were the first relators to identify Defendants Dent, Johnson, and Mallory, their allegations against Defendants Dent, Johnson, and Mallory necessarily satisfy the material elements test for the purposes of the North Carolina FCA's first-to-file bar.

## IX. Whether the Lutz–Webster Complaint Sufficiently Pleads State Law Claims

Defendant Mallory argues that Lutz and Webster's California and Illinois FCA claims should be dismissed because their Second Amended Complaint (1) alleges no connection between Mallory and the two states and (2) fails to meet the heightened pleading standards required by Rule 9(b). (Dkt. No. 143–1 at 17–18).[6] Neither argument is availing.

Relator Lutz owns and operates a billing service in South Carolina. From March 2011 to September 2011, she provided billing services to Dr. Lloyd Miller, a primary care physician in Florence, SC. Relator Webster is a registered nurse, and she worked for Dr. Miller as a Nursing Supervisor from May 2008 to July 2013. Over the course of their interactions with Dr. Miller's practice, Relators Lutz and Webster collectively (1) learned of "Defendants' efforts to provide inducements to physicians"; (2) observed "Dr. Miller's billings to government healthcare programs and private insurers for patient blood draws"; (3) reviewed the results of patient blood tests from HDL and Singulex; (4) became familiar with "Defendants' marketing efforts and practices"; and (5) became familiar with "Dr. Miller's practices with regard to patient referrals and patient blood draws." (Dkt. No. 40–1 at 13–15).

The complaint also alleges that HDL, the company of which Mallory was the founder and CEO, (1) receives significant revenue from private insurers in California

---

**6.** Defendants Dent, Johnson, and BlueWave have withdrawn their argument that Lutz and Webster are not "interested parties" under the applicable Illinois and California insurance fraud prevention statutes. (*See* Dkt. No. 162 at 10 n.3).

and Illinois (*id.* at ¶ 119); (2) is paid by private insurers with clients in Illinois and California who were referred for testing due to the scheme (*id.* at ¶ 150); (3) and offered P&H fees to physicians in California and Illinois (*id.* at ¶ 322). The complaint also identifies—by name—several physicians in various states, including California, who stopped referring patients to Berkeley once BlueWave, Dent, and Johnson began marketing the HDL tests pursuant to their fraudulent scheme to induce more payment. (*Id.* at ¶ 323). The complaint also alleges that Mallory signed HDL kickback checks made payable to physicians, physicians' practices, or a related corporate entity. (*Id.* at ¶ 190).

■■■ As a preliminary matter, the Court is satisfied that the allegations contained in the Lutz–Webster Second Amended Complaint are sufficient to support a connection between Mallory and the states of California and Illinois. The highly detailed, 114–page complaint clearly ties her to the alleged fraudulent scheme to induce physicians to order lab tests. And although the Relators may have initially learned of the scheme based on their interactions with a South Carolina-based physician, they have supplemented their complaint with sufficient facts to allege a nationwide scheme. (*See, e.g.,* Dkt. No. 40–1 at ¶¶ 325) (HDL's national promotional program has included offering potential physician customers 'processing fees' for each patient referred to HDL."); *see also U.S. ex rel. Spay v. CVS Caremark Corp.,* 913 F.Supp.2d 125, 174–75 (E.D. Pa. 2012) (collecting cases where "specific claims in one state or region satisfy Rule 9(b) requirements by establishing a nationwide inference of fraud").

Defendant Mallory's reliance on *United States v. Triple Canopy, Inc.,* 775 F.3d 628 (4th Cir. 2015), to support her argument is misplaced. In *Triple Canopy,* a relator al-

leged that a government contractor had defrauded the government because it had not adhered to terms of five different contracts requiring guards at five military bases in Iraq to have a certain level of training. *Id.* The relator's complaint contained specifics regarding the fraud and individuals involved scheme for one of the contracts. But for the four remaining claims, the relator simply alleged that the guards were "transferred [to the locations covered by the remaining contracts] while still not qualified to provide security services." *Id.* at 640 (internal quotation marks omitted). The Fourth Circuit held that this failed to satisfiy Rule 9(b)'s pleading requirements because the relator did nothing more than simply presume that the contractor submitted false claims under those contracts. *Id.*

By contrast, Relators Lutz and Webster do much more than simply allege that because the fraud was occurring in South Carolina, it must also be occurring in other states as well. As discussed above, they identify specific incidents that occurred in different states. Because these allegations are made with sufficient particularity to put Mallory on notice of the who, what, where, when, and how of the fraud, and the Court finds that the Lutz–Webster Second Amended Complaint satisfies the pleading requirements.

## X. Whether the Mayes Fourth Amended Complaint States a FCA Presentment Claim (31 U.S.C. § 3729(a)(1)(A)) Against Quest

The Mayes Fourth Amended Complaint alleges that after Defendant Quest acquired Berkeley in May 2011, Quest directed Berkeley to continue to pay draw fee kickbacks through January 2012. (Dkt. No. 83 at 7). To "get around" the draw fee restrictions, Quest began providing new kickbacks, which included paying the sala-

ries of providers' phlebotomists, leasing space from providers, providing valuable software services, and paying high draw fees for commercially insured patients. (*Id.* ). Berkeley went out of business in August 2013, and Quest stripped Berkeley of valuable assets without paying fair market value for those assets, (*Id.* at ¶ 8). Defendant Quest now argues that the Mayes' Fourth Amended Complaint should be dismissed because it fails to state a FCA Presentment claim under 31 U.S.C. § 3729(a)(1)(A). (Dkt. No. 146). The Court disagrees.

To state a cause of action under § 3729(a)(1)(A), the complaint must allege that the Quest "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval." "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a–7b(g). The Court will first examine whether the Complaint alleges an AKS violation and then turn its attention to whether it alleges an FCA violation.

### A. AKS Violations

 By the Court's reading of the complaint, Relator Mayes alleges violations of 42 U.S.C. § 1320a–7b(b)(2)(A).[7] Section 1320a–7b(b)(2)(A) makes it illegal to (1) knowingly and willfully, (2) offer or pay, (3) any remuneration, (4) to any person to induce such person, (5) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. To allege that Quest knowingly and willfully acted, Mayes need only allege that to Quest acted with a purpose to commit a wrongful act. *See, e.g., United*

States v. McClatchey, 217 F.3d 823, 829 (10th Cir. 2000). The Mayes Fourth Amended Complaint alleges several violations of this section.

First, the Complaint alleges that Quest offered to—and did—pay the full salary of Heritage Medical Partners' (HMP) phlebotomist. (Dkt. No. 83 at ¶ 32). Although the AKS provides certain safe harbors that allow a laboratory to pay for a provider's phlebotomist, this is limited to "a phlebotomist who collects specimens from patients for testing by the outside laboratory." Publication of OIC Special Fraud Alerts, 59 Fed. Reg. 65,372 (December 19, 1994). "The statute is implicated when the phlebotomist performs additional tasks that are normally the responsibility of the physician's staff" *Id.* The complaint alleges that the phlebotomist performed such tasks after Quest began paying her salary. (Dkt. No. 83 at ¶ 32). The complaint also alleges that this remuneration was knowing and willful (*id.* at ¶ 31) (developed to "get around" draw fee restrictions); and made with the purpose of inducing referrals (*id. at* ¶ 35). In other words, it alleges an AKS violation.

Quest's only rebuttal regarding the phlebotomist is that the complaint failed to set forth any facts showing that she actually performed any additional tasks for HMP that were not associated with the collection of specimens from patients for testing by Quest. This ignores the fact that the Complaint clearly alleges that the phlebotomist "would perform the blood draws for all of the lab tests HMP ordered, even the basic test panels that HMP performed in their offices." (*id.* at ¶ 32).

 Second, the complaint alleges that Quest provided HMP additional kickbacks in the form of (1) leasing office space from

---

7. The Mayes Fourth Amended Complaint incorporates, by direct reference to the Government's Complaint in Intervention, 42 U.S.C. § 1320a–7b(b).

HMP, (2) offering to "integrate HMP's electronic medical records system with Quest's system, allowing the physicians immediate access to their patient's lab results ... at no cost," and (3) "paying physicians hugely inflated draw fees for their commercial insurance patients." (Dkt. No. 83 at ¶ 36–37). Again the complaint alleges that these offers or payments of remuneration were made knowingly and willfully (*id.* at ¶ 31), and for the purpose of inducing referrals (*id.* at ¶¶ 36–39). Taking these allegations as true, the Complaint states a violation of § 1320a–7b(b)(2)(A).

 Quest argues that the lease claim and electronic medical records system claim fail to state a claim for relief because the Complaint fails to allege that these acts fall outside of their respective safe harbors. (*See* Dkt. No. 146–1 at 32–34) (citing 42 C.F.R. §§ 1001.952(b), 1001.952(y)(10)). This argument is unavailing, however, because "safe harbors are affirmative defenses, and the defendant carries the burden of proof at trial." *U.S. ex rel. Bartlett v. Ashcroft*, 39 F.Supp.3d 656, 676 (W.D. Pa. 2014) (citing *United States v. Rogan*, 459 F.Supp.2d 692, 716 (N.D. Ill. 2006); *United States v. Job*, 387 Fed.Appx. 445, 455 (5th Cir. 2010) (unpublished); *United States v. Norton*, 17 Fed. Appx. 98, 102 (4th Cir. 2001) (unpublished)).

The Court also finds Quest's arguments that the Complaint failed to allege that Quest ever actually entered into a lease for office space, integrated its system with HMP's electronic records system, or made any payments of draw fees provided to Quest by private insurers to be unavailing. The AKS prohibits both the offer *and* the payment of remuneration, and the complaint clearly alleges that offers were made.

 Finally, the Court turns to the allegation that Quest itself made payments to physicians for blood draws. (Dkt No. 83 at ¶ 28 (February 15 and March 19, 2012 payments identified as "BHL—BLOOD DRAWS")). At first glance, this appears to be a clear violation of the AKS. Taking all allegations in the complaint as true, Quest knew that the payments were improper based on its termination of the program, as evinced by its legal department's concerns and ultimate termination of the plan. (*Id.* at ¶ 27). In addition, Quest paid remuneration to physicians who had provided referrals. (*Id.* at ¶ 28). However, by the time Quest made these payments, the *inducement* had already occurred. Accordingly, the complaint fails to allege that these payments violated § 1320a–7b(b)(2)(A).

### B. FCA Presentment Violation (§ 3729(a)(1)(A))

 To state a cause of action under § 3729(a)(1)(A), Mayes must allege that Quest "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval." As discussed above, the Mayes complaint alleges that the various post-P&H Kickback Scheme inducements constitute AKS violations. Because AKS violations are false claims, 42 U.S.C. § 1320a–7b(g), any claim that Quest presented or caused to be presented to the government that is tainted by an AKS violation will constitute a FCA violation.

The Court finds that the Mayes Complaint alleges an FCA presentment violation with enough specificity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. It alleges that Quest paid physicians illegal remuneration to induce referrals for lab tests that were reimbursed by the Government through Medicare and TRICARE. (Dkt. No. 83 at 19–20, 31–39). Quest manifested the intent to "get around" the illegal draw fees no later than January 10, 2012. (*Id.* at 27, 31) (visit to

HMP from Marc Biemiller, a Quest representative). This satisfies the who, what, where, when, and how of the fraud required by Rule 9(b). In addition, the stated desire to "get around" the draw-fee prohibition satisfies the FCA's scienter requirement, and the Court finds that the universe of false claims encompasses all of the Medicare or TRICARE claims submitted by either Berkeley or Quest that were tainted by the schemes that replaced the P&H Kickback Scheme (i.e., paid phlebotomist, offer to lease office space, offer to integrate electronic records system, and offer to pay exorbitant draw fees for private insurance clients).

▮ Mayes also purports to asserts a veil-piercing claim against Quest because it "abused the corporate form." (*See* Dkt. No. 168 at 11–16). By necessity, any veil-piercing action against Quest would relate to the underlying accusations against Berkeley. Because the Government has intervened as to Berkeley, the Complaint in Intervention controls the substantive claims against Berkeley, and Mayes has no standing to assert the veil-piercing claim. *Cf. U.S. ex rel. Feldman v. City of New York*, 808 F.Supp.2d 641, 649 (S.D.N.Y. 2011) (dismissing relator's kickback claims because they were "superseded by the Government's kickback claims").

Finally, the Court need not address Relator Mayes's arguments regarding the presentment of claims related to Berkeley's participation in the P&H Kickback Scheme because the Court has held that the Complaint failed to allege that Quest's involvement in the P&H Kickback Scheme rose to the level of an AKS violation.

### XI. Whether the Mayes Fourth Amended Complaint States a FCA Conspiracy Claim (31 U.S.C. § 3729(a)(1)(C)) Against Quest

▮ To state a cause of action under 31 U.S.C. § 3729(a)(1)(C), the Mayes Fourth Amended Complaint must allege that Quest "conspire[d] to commit a violation of [§§ 3729(a)(1)(A)]." The complaint must allege the existence of an agreement to violate the FCA and at least one act performed in furtherance of that agreement. *U.S. ex rel. DeCesare v. Americare In Home Nursing*, 757 F.Supp.2d 573, 584 (E.D. Va. 2010). Quest argues that the complaint fails to state a conspiracy claim because (1) a corporate parent cannot conspire with its wholly owned subsidiary, and even if it could, (2) Mayes failed to sufficiently allege any agreement between Quest and Berkeley to violate the FCA. The Court agrees.

As discussed earlier, the intracorporate conspiracy doctrine stands for the proposition that because a conspiracy requires two or more persons, a corporation cannot conspire with its agents. *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985). From the time of its acquisition in May 2011 to its going out of business in August 2013, Berkeley was a wholly owned subsidiary of Quest. Mayes does not contest the applicability of the intracorporate conspiracy doctrine. Instead, he argues that "Quest conspired with Berkeley prior to its acquisition." (Dkt. No. 168).

To support this pre-acquisition conspiracy theory, Mayes cites only one paragraph from the complaint—Paragraph 42. In its entirety, that paragraph states

Relator therefore also believes and alleges that, through minimum appropriate pre-purchase due diligence, Quest knew about or through reckless disregard and/or willful blindness failed to discover Berkeley's use of unlawful kickback payments to physicians as a principal component of Berkeley's marketing strategy. Quest nevertheless agreed with Celera and Berkeley to go forward

with the purchase without insisting that such misconduct be stopped and/or that it be disclosed to the United States and remedied.

At most, this paragraph alleges that Quest had pre-acquisition knowledge of Berkeley's wrongdoing. The only agreement discussed in this paragraph is the agreement to finalize the acquisition. Even the most lenient reading of this paragraph cannot support the conclusion that Quest and Berkeley entered into a pre-acquisition agreement to violate the FCA. Accordingly, the intracorporate conspiracy doctrine bars the FCA conspiracy claim.[8]

But even if the intracorporate conspiracy doctrine did not apply, the Court would still dismiss the conspiracy claim for failure to allege the existence of an agreement to violate the FCA.

## XII. Conclusion

For the abovementioned reasons, the Court **DENIES** Defendant Mallory's motion to dismiss the Government's Complaint in Intervention (Dkt. No. 88), Defendants BlueWave, Dent, and Johnson's motion to dismiss the Government's Complaint in Intervention (Dkt. No. 91), and Defendant Mallory's Motion to Dismiss the Second Amended Complaint of Relators Lutz and Webster (Dkt. No. 143).

The Court **GRANTS** in part and **DENIES** it in part Defendant Berkeley's motion to dismiss the Complaint in Intervention in part. (Dkt. No. 110). The FCA claims against Berkeley that arose before June 30, 2005 are barred by the applicable statute of limitation. If, for any reason, the Government's unjust enrichment and pay-

ment by mistake of fact claims are *not* federal common law claims, it is directed to file an amended complaint within 14 days of this order specifying the source of law.

The Court **GRANTS** in part and **DENIES** in part Defendants BlueWave, Dent, and Johnson's motion to dismiss Relators Lutz and Webster's Second Amended Complaint. (Dkt. No. 149). Due to the North Carolina FCA's first-to-file bar, the Court lacks jurisdiction over the North Carolina FCA claim against BlueWave.

The Court **GRANTS** in part and **DENIES** in part Defendant BlueWave's motion to dismiss the Riedel complaint (Dkt. No. 139). The first-to-file bar applies to Riedel's claims alleging inflated packaging fees and medically unnecessary testing. Therefore, the Government did not intervene as to his complaint. But because the Government has intervened on these claims pursuant to the Mayes complaint, this has no effect on the Court's jurisdiction to hear these claims. Riedel remains a *qui tam* plaintiff pursuant to 31 U.S.C. § 3730(c)(3) and may continue to pursue the action. But because the complaint fails to satisfy Rule 9(b)'s pleading requirements, the Riedel complaint is dismissed without prejudice. Riedel's request for leave to amend is granted and Riedel shall have 14 days from the date of this order to file an amended complaint.

The Court **GRANTS** in part and **DENIES** in part Defendant Quest's motion to dismiss the Fourth Amended Mayes Complaint (Dkt. No. 146). The complaint states an FCA presentment cause of action, but does not state a conspiracy cause of action.

---

8. Mayes's response to the motion to dismiss also alleges that the facts that Berkeley continued to make payments after its acquisition, that Quest itself issued payments to physicians for blood draws, and that quest sought out ways to make up for the loss of draw fee revenue would support a jury's conclusion that Quest and Berkeley entered into an agreement before the acquisition to continue the illegal draw fee payments. (*See* Dkt. No. 169 at 21). The Court finds this support to be even less persuasive than Paragraph 42.

Accordingly, Count II of the complaint (Dkt. No. 83) is dismissed. The Court **DENIES** Relator Mayes's request to amend his complaint, as it pertained only to amending the complaint to add specific false claims.

**AND IT IS SO ORDERED.**